**ANDREWS et al. v. BROWN et al.***
(No. 6914.)

(Court of Civil Appeals of Texas. Austin.
March 31, 1926. Rehearing Denied
May 5, 1926.)

**1. Life estates ⬚12—Bonus for oil lease on land which was subject to life estate held in part payment for entire title to oil, and hence to belong to remaindermen, subject to estate of life tenant.**

Bonus of $62,500 for an oil lease on 65 acres *held* in part payment for conveyance of entire title to the oil therein, not for conveyance of the estate of the remaindermen alone or of the estate of the life tenant alone, and hence to be the property of the remaindermen, subject to the estate of the life tenant.

**2. Mines and minerals ⬚78(1)—Oil lease for consideration of $62,500, providing for royalties and conditioned to terminate unless well should be commenced, unless renewed by yearly payment, held present conveyance of title to oil, leaving mere possibility of reverter.**

Lease executed in consideration of payment of $62,500 for operating for oil on royalty basis for so long as oil was produced, conditioned to terminate unless a well should be commenced, unless renewed yearly by payment of $65, *held* a present conveyance of title to the oil, which title would, however, revert ipso facto on breach of condition.

**3. Mines and minerals ⬚79(1)—In determining whether bonus for oil lease was for conveyance of title to oil or rent, entire transaction must be viewed in light of surrounding circumstances and nature of business.**

In determining whether a bonus which was given for making an oil lease was payment for conveyance of title to the oil or merely rent, entire transaction must be viewed in the light of surrounding circumstances and the nature of the oil producing business.

**4. Life estates ⬚12—In partitioning payment for title to oil in ground, heirs of life tenant are entitled to net value of use of payment during life of life tenant.**

In partitioning a payment made for conveyance of title to the oil in a tract of ground between heirs of life tenant and remaindermen, the heirs are entitled to the net value of use of payment during life of life tenant; not to the portion life tenant could have secured by partition.

**5. Deeds ⬚196(3)—Burden of proving undue influence by sons in procuring deed from father held upon those asserting it, where no fiduciary relation which would shift burden to grantees existed.**

Burden of proving undue influence by sons in procuring deed from father *held* upon those asserting it, where no fiduciary relation which would shift burden to grantees existed.

**6. Descent and distribution ⬚115—Burden of proving that ancestor had not made equal division of property between children prior to death is upon heirs asserting it.**

Burden of proving that ancestor had not made equal division of his property between his children prior to death is upon heirs asserting it in partition suit and asking that gifts be thrown into hotchpot, under the general rule that the burden rests upon the party holding the affirmative of an issue of fact.

**7. Trial ⬚215.**

When a case is submitted on special issues, a general charge is properly refused.

**8. Torts ⬚14—Suit against bank, seeking to charge depositor's account with trust, causing bank to refuse depositor's checks, gives depositor no right of action.**

That plaintiffs brought suit against bank, seeking to charge depositor's account with a

---

trust, and bank refused to pay depositor's checks pending litigation, gives depositor no right of action against plaintiff.

Appeal from District Court, Navarro County; Hawkins Scarborough, Judge.

Suit of trespass to try title by Maggie Andrews and others against W. A. Brown and others, and suit for partition of the estate of N. H. Brown, deceased, by W. A. Brown and another, against Maggie Andrews and others. From the judgment, both plaintiffs and defendants appeal. Affirmed in part, and reversed and remanded in part.

Gibson & Lovett, Jester & George, and Richard Mays, all of Corsicana, for appellants.

J. S. Callicutt, R. B. Molloy, W. H. Jack, and W. Harry Jack, Jr., all of Corsicana, for appellees.

McCLENDON, C. J. The litigation involved in this appeal is among the heirs at law of N. H. Brown, deceased. It had its inception in a controversy over $57,500, which was the net amount received by W. A. and S. H. Brown, two of the sons of N. H. Brown, as a bonus for an oil lease on 65 acres of land in Navarro county, which land had been conveyed to W. A. and S. H. Brown by their father, he reserving in himself, however, a life estate in the minerals. This controversy furnishes the main bone of contention between the parties, and but for it the litigation in all probability would never have arisen.

The controlling facts which the appeal involves may be briefly summarized, chronologically, as follows:

The wife of N. H. Brown died intestate about 40 years before the litigation began. Of this marriage there were born nine children (six daughters and three sons). Some years prior to the litigation one of the daughters, who had married one Richie, died, leaving three children, to whom we will refer as the Richie children. The record does not disclose the condition of the community estate of N. H. Brown and wife at the death of the latter, but it is quite apparent that the value of the estate was small. Subsequently to the death of his wife N. H. Brown moved to Navarro county. He was a farmer, and appears to have been a good business manager and accumulated from time to time a great deal of land. Some 15 years or more before his death he adopted the policy of dividing up his estate among his children, and gave to each of them, with the exception of one of his daughters, a tract or tracts of land aggregating from 80 to 100 acres. To this daughter he gave the proceeds (about $5,000) of the sale of a tract of about the same acreage as that given to the other children. His method in making these donations was first to make a verbal gift, putting the

donee in possession for a number of years, and later making a deed. He began this policy about 1904 or 1905, and began making deeds about 1916. To his three sons (W. A., S. H., and C. A. Brown) he gave jointly a tract of 100 acres, of which the 65 acres above referred to is a part, and, in addition, he gave each a tract of 60 acres, making 93⅓ acres to each. The three sons moved onto different portions of the 100 acres shortly after the gift, which was some time about the year 1908, and each made some improvements on the portion of which he took possession. W. A. and S. H. Brown acquired from the third son, C. A. Brown, his interest in the 100-acre tract, and in 1917 N. H. Brown conveyed this tract jointly to W. A. and S. H. Brown. The conveyance, which is in the ordinary form of a general warranty deed, contained the following reservation:

"It is distinctly understood, however, that I reserve to myself, for and during my lifetime, all of the oil, gas and other minerals in, under and upon said land, and all of the royalties arising therefrom, such oil, gas, mineral rights and royalties to become the property of the grantees upon my death."

N. H. Brown had acquired this 100-acre tract in 1901, paying therefor $35 an acre. About 1905 he executed an oil lease on the tract, under which the lessees developed a number of shallow wells. These wells were on both the 35-acre and the 65-acre portions of the tract, and those on the 35-acre portion were still producing when N. H. Brown died. The wells on the 65-acre tract ceased to produce and were abandoned many years ago; and a short time before the trial suits had been instituted by S. H., W. A., and N. H. Brown to cancel the lease. This litigation was compromised about January, 1923, and the lease was canceled as to the 65 acres. N. H. Brown collected and appropriated all the royalties under this lease up to the time of his death. This land was located near Powell, and on January 7, 1923, a deep test well which was being drilled in the vicinity was brought in as a very large producer. This fact at once created a demand for oil leases in the vicinity and ran the price of leases to as high as about $1,000 an acre bonus, according to the location of the land with reference to the "discovery well." Two days later W. A. and S. H. Brown concluded negotiations with one Wortham, who was an oil lease broker, for a lease upon the 65 acres under the following terms: The lease was to be made to the Roxana Petroleum Company on what is commonly known as form 88; a bonus of $62,500 was to be paid on delivery of the lease, of which sum Wortham was to receive $5,000; the lessee company was to pay one-eighth royalty on all oil produced, and out of one-half of the remaining seven-eighths it was also to pay to Wortham an additional $5,000.

While these negotiations were being conducted an agreement was made between W. A. and S. H. Brown, and N. H. Brown, whereby the former were to pay the latter $1,000 for his life estate in the minerals in the 65 acres. The evidence is clear and conclusive that N. H. Brown was cognizant of the negotiations with Wortham, and knew the exact amount that was being paid as a bonus for the lease. This lease was executed by W. A. and S. H. Brown on January 10, 1923, and placed in escrow pending payment of the bonus. On the same day there was executed and recorded a deed from N. H. Brown to W. A. and S. H. Brown conveying the grantor's life estate in the minerals in the 65 acres for the recited cash consideration of $1,000. The $1,000, however, was not actually paid at that time, but a note was given by W. A. and S. H. Brown to N. H. Brown for this amount, with the understanding that it was to be paid out of the bonus whenever it was paid. It appears that the Roxana Company required the execution and recording of an unconditional conveyance from N. H. Brown to his two sons before it would pay the bonus money. The bonus was paid on January 21, 1923, and the money distributed, $5,000 to Wortham and $28,750 each to W. A. and S. H. Brown, each of whom gave his check to N. H. Brown for $500; and the $1,000 note was receipted in full by him. In the meantime information regarding the lease had come to the knowledge of the daughters of N. H. Brown, and after some attempted negotiations with their father and brothers, which appear not to have been of an altogether pleasant or peaceful nature, they employed counsel, and on January 25, 1923, instituted a suit against their father and two brothers, W. A. and S. H. Brown. In this suit the five living sisters, the three Richie children, and C. A. Brown were named as plaintiffs, and N. H., W. A., and S. H. Brown as defendants. C. A. Brown later asked to be dismissed as party plaintiff, and testified that he had never authorized bringing the suit. Some of the plaintiffs testified that it was not their intention, and they gave no authority to their attorneys, to make N. H. Brown a party defendant. The suit was in form one in trespass to try title. It was evidently brought upon the hypothesis that the 100-acre tract was community property of N. H. Brown and wife. The plaintiffs sought to recover one-eighteenth interest each in the 100 acres, and one-ninth interest each in $30,000, which represented, as they evidently then thought, one-half of the bonus for the Roxana lease. N. H. Brown employed attorneys to defend this suit. He died on June 8, 1923. Shortly after his death plaintiffs amended their pleadings and sought to set aside the conveyance of N. H. Brown to W. A. and S. H. Brown of his life estate in the minerals on the 65 acres, on the ground of undue influence, and recover on the basis

that the bonus paid for the Roxana lease was the property of the life tenant, N. H. Brown, and should be divided accordingly. They also made the wives of W. A. and S. H. Brown parties as well as a number of banks, and sought to impound all money on deposit to the credit of W. A. or S. H. Brown and their wives as impressed with a trust to secure the recovery which they sought. Shortly after this W. A. and S. H. Brown instituted a suit in the same court against all of the other heirs at law of N. H. Brown, in which they sought a partition of the N. H. Brown estate. These two suits were later consolidated and tried together. In the partition suit the plaintiffs in the first suit alleged that the distribution made by N. H. Brown among his children was not equal, and they asked that the gifts to each child be thrown in hotchpot (or hotchpotch as our statute denotes it). The consolidated suits were tried to a jury upon special issues, resulting in the following findings: (1) That N. H. Brown was unduly influenced in executing the deed of January 10, 1923, conveying to W. A. and S. H. Brown his mineral estate in the 65 acres; (2) that the reasonable market value on January 10, 1923, of N. H. Brown's life estate in the minerals, etc., in the 65 acres was $8,000; and (3) that each of the children of N. H. Brown received an equal amount of property from him previous to his death.

A number of other questions were asked the jury in the alternative, but they were unnecessary under the findings made, and no answers were given. Both parties moved for judgment upon these findings, both motions were overruled, and the court rendered judgment finding specifically the property belonging to the estate of N. H. Brown, deceased, and decreeing to each plaintiff and defendant (the Richie children being taken as one unit) a one-ninth undivided interest therein, and decreeing a partition. W. A. and S. H. Brown were decreed to be indebted to the estate in the sum of $7,000, the amount the jury found as the value of N. H. Brown's life estate in the minerals in the 65 acres, less the amount paid for the deed thereto. The various amounts which were disclosed to be on deposit in the several defendant banks to the credit of W. A. or S. H. Brown were charged with a lien to secure the estate in this $7,000, and all the property generally which W. A. and S. H. Brown had purchased with the proceeds of the bonus was charged with a like lien. Other details of the judgment will be stated later where necessary. Both parties have appealed from this judgment. For convenience, where appellants or appellees is used, the reference is to plaintiffs or defendants respectively in the first suit.

The contentions of appellants are: First, that under the reservation of a life estate in the minerals, etc., in the deed from N. H.

to W. A. and S. H. Brown, the entire net bonus, $57,500, belonged to the life tenant, and upon setting aside the deed conveying this life estate to appellees the entire net amount of the bonus less $1,000 constituted a part of the estate of N. H. Brown; second, that the burden of proof, was improperly placed upon appellants to establish undue influence; and, third, that the burden of proof was improperly placed upon appellants to establish that there had not been an equal division of the property of N. H. Brown prior to his death.

The contentions of appellees are: First, that the evidence is insufficient as a matter of law to raise the issue of undue influence; second, that the court's charge on undue influence was erroneous in a number of particulars; third, that the bonus was a part of the purchase money for the entire title to the oil and minerals, in which N. H. Brown only owned a life estate, and right of recovery in this regard was limited to the value of the use of the money during the life of N. H. Brown; fourth, that there was no basis in the evidence for the jury's finding that N. H. Brown's life estate had a market value of $8,000.

In addition there are some questions raised with reference to the money and property impounded or charged with a lien, which questions will be referred to later.

[1-3] We will first consider the status of the $57,500 net bonus, under the assumption that the deed of N. H. Brown to his life estate in the minerals was properly set aside for undue influence. We have not been cited to any authority which specifically settles this question, but, from general principles, now well established in this and other states, we have reached the conclusion that the bonus was a part of the consideration for a conveyance of the entire title to the minerals, and as such was the property of the remaindermen, subject to a life estate therein in N. H. Brown. It will not be necessary, we think, to do more than state these general principles citing some of the cases in their support, and point out their application to the concrete question before us.

The lease to the Roxana Corporation "granted, demised, leased, and let" the 65 acres "for the sole and only purpose of mining and operating for oil and gas and of laying pipe lines and of building tanks, power stations, and structures thereon to produce, save, and take care of said products." The consideration expressed was $62,500, cash, and "the covenants and agreements hereinafter contained on the part of lessee to be paid." The lease stipulated:

"It is agreed that this lease shall remain in force for a term of five years from date, and as long thereafter as oil or gas, or either of them is produced from said land by the lessee."

The covenants stipulated were those usually found in such instruments, such as payment of a royalty of one-eighth of the oil and gas produced and $100 for each gas well. If no well should be commenced on or before January 10, 1924, the lease was to terminate as to both parties, unless the lessee should pay to the lessors $65, which payment would extend the lease for 12 months. By like payments the lease could be extended for the full five-year period.

Instruments of this character have been frequently before the courts of this state for adjudication, and, while they are usually referred to as oil and gas leases, it is now well settled that they constitute, from the time of their execution, a present conveyance of and effect the passing of the entire title to the designated minerals existing in the land. The conveyance is of the fee upon limitation, and nothing remains in the grantor or lessor but what is termed the possibility of reverter. Upon breach of the conditions expressed in the lease, the title conveyed reverts, ipso facto, to the lessor or his assigns, but so long as there is no breach of the conditions, the fee to the minerals is in the lessee. Stephens County v. Oil Co., 254 S. W. 290, 113 Tex. 160, 29 A. L. R. 566; Caruthers v. Leonard (Tex. Com. App.) 254 S. W. 779.

It is quite clear, therefore, that what passed by the lease was the entire title to the minerals, which included both the life estate of N. H. Brown and the remainder of appellees. For this entire title, the only consideration moving to its owners was the bonus, the royalties, and $100 for each gas well, if and when oil or gas was produced as provided in the lease.

We find it unnecessary to determine the status of the royalties under the reservations of the 1917 deed, if any had accrued during the life tenure. Had there been no severance of the mineral title, and had N. H. Brown reserved a life estate in the land, such royalties would have belonged to the remaindermen, with a life estate therein in the life tenant. State v. Hatcher, 281 S. W. 192 (opinion of Commission of Appeals adopted by Supreme Court); State v. Snyder, 212 P. 758, 29 Wyo. 163. A very able discussion of this question is presented in the opinions in these cases. In the latter the court say:

"We can find no cases where the proceeds of mineral leases, under circumstances such as exist in the case at bar, have been treated as ordinary rental in the sense contended for; and the authorities are numerous—extending as far back into the centuries of the past of Anglo-Saxon jurisprudence as the lights available permit us to search and find—and are unanimous in holding that the proceeds arising therefrom under facts similar to those in the case at bar are and must be treated as principal."

In the instant case, however, the entire 100 acres was, at the time N. H. Brown conveyed to appellees in 1917, incumbered with an oil and gas lease, and on portions of the tract there were then producing wells,

from which N. H. Brown was receiving royalties. These royalties he continued to collect and appropriate up to the time of his death, and his right to do so was never questioned. At the time the Roxana lease was executed, the former lease had been canceled or was in process of cancellation as to the 65 acres, and the title to the minerals stood in appellees in remainder, and in N. H. Brown for life. Whether under the language of the 1917 deed the royalties which might accrue under the Roxana lease during N. H. Brown's life passed to the life tenant is a question of no little difficulty, and its decision could have no controlling effect upon a proper determination of the questions before us. Its only relevancy consists in the probable or speculative value of the life estate which N. H. Brown conveyed to appellees for $1,000—viewed as of the time of that conveyance—as touching upon the issue of undue influence, as that issue might be affected by the question whether N. H. Brown was overreached or received fair value for what he conveyed. The evidence would warrant a finding that N. H. Brown thought he was entitled to and was conveying such royalties, and that the parties to the instrument were dealing with each other on that basis.

The question of the status of royalties accruing during the life estate under the reservation in the 1917 deed cannot, we think, affect the status of the bonus. The reservation was of all oil, gas, and other minerals during the lifetime of N. H. Brown "and all the royalties arising therefrom, such oil, gas, mineral rights and royalties to become the property of the grantees upon my (N. H. Brown's) death." The bonus was clearly not royalties. Its ownership depends upon a proper answer to the question whether it constituted a part of the consideration for the conveyance of the entire title to the minerals, or whether, on the other hand, it constituted revenue or rentals, or was a payment for the mere privilege of holding the lease in effect for the first year of its duration.

In the case of Caruthers v. Leonard, above, the annual payments of $1 an acre were held to be "in the nature of rents on the whole land," which do not pass by a subsequent conveyance of the minerals only, but remain, in the absence of an express assignment, in the owner of the land. The bonus, in the case we have before us, evidently stands upon a footing wholly different from that of the annual renewal payments. It is true that its payment had the effect of preventing forfeiture of the lease for the period of one year from its execution date. But that fact presents its only analogy to the annual extension payments.

In determining the status of the bonus— that is, the true consideration for its payment—it is necessary to view the entire transaction in the light of the surrounding circumstances and of the nature and properties of the subject-matter of the Roxana lease. The latter is discussed in Oil Co. v. Meredith (Tex. Civ. App.) 258 S. W. 550, affirmed (Tex. Com. App.) 272 S. W. 124. This subject-matter consisted of oil and gas, the very existence of which, and the amount if it did exist, being problematical. On the adjoining 35 acres shallow wells had been producing a small quantity of oil for a number of years. On the 65 acres there had been some producing shallow wells, but they had long since been abandoned as unprofitable or entirely exhausted. On January 7, 1923, a deep test well was brought in as a large producer in the vicinity of the 65 acres. Indications at first pointed to an extension of the field toward the 65 acres. As pointed out in the Meredith Case:

"We know that the mining of oil and gas is accomplished only by drilling in the earth, and that this entails a great deal of expense. We also know that even in proven territory the results of such drilling are uncertain; and that the business is therefore precarious and hazardous, and is only undertaken through long-time leasehold contracts, which give to the lessees a large interest in the oil produced, usually seven-eighths, and to the owner usually only a royalty of one-eighth, except where the prospects are considered sufficiently encouraging to warrant payment of a lump sum in addition, called a 'bonus,' which in some instances is quite large."

The effect produced by the bringing in of the discovery well was to immediately enhance the value of oil leases on land in the vicinity, and this enhanced value was, as is usually the case, added in the form of a bonus, which was over and above the royalty of one-eighth provided in the ordinary commercial form of lease. The evidence shows that in some instances bonuses as high as $1,000 an acre were paid for leases in the neighborhood, and the gross amount of the bonus in question fell only a little short of that figure. Viewed, therefore, as of the date of the lease, the bonus represented the amount the lessees were willing to pay for the lease, in the way of a lump sum, over and above the usual nominal amount where the land is not in proximity to a proven field. It seems to us manifest from the very nature of the subject-matter dealt with, and the conditions necessarily incident to the profitable development of that subject-matter, that a life estate in the mineral had no substantial value apart from the remainder, from the viewpoint of one interested in mining for oil and gas. There is no evidence in the record that the life estate, standing alone, had any value to any one for any purpose. The life tenant himself could not with any degree of prudence afford, if he were financially in position to do so, to invest the amount of money necessary to drill for oil and gas, when his only possible return, at most, would be the

oil and gas he might extract from the land during his lifetime. Especially is this true when we consider the extreme age of the life tenant. It is too clear to require argument that the lease was made, as its express terms imply, with reference to the entire estate, both life and remainder, in the minerals as a whole. Nothing could be more palpable than that the Roxana Corporation would never have paid $62,500 for N. H. Brown's life estate in the minerals, if, in fact, it would have paid therefor any sum whatsoever. On the other hand, it is hardly probable that a lease with any substantial bonus could have been made which did not cover the life estate as well as the remainder. If there had been a conveyance for a lump sum of the entire estate in the minerals by unconditional deed, there could be no question but that this lump sum would be the property of the remaindermen subject to a life interest therein in the life tenant. The lease had the same effect as such deed in so far as passing the full title to the minerals was concerned. It differed from such deed only in the two respects that it was upon limitation, and that the lump sum did not constitute the entire consideration. We are unable to resist the conclusion that the bonus constituted a part, and a very substantial part, of the consideration for the entire title to the minerals conveyed by the lease; that it constituted a part of the proceeds of the corpus of the estate; and that its ownership was in the life tenant and remaindermen in the same respective interests as their ownership in the minerals before the lease was executed.

[4] This is the evident view entertained by the trial court. But we think that court was in error in submitting to the jury, in the form it was submitted, the issue of the value of the life estate, and in rendering judgment upon the jury's finding of that value as $8,-000. There is no evidence in the record from which the value of the life estate could be determined. The evident theory upon which this issue was submitted was that the heirs of N. H. Brown were entitled to recover as the value of his life estate such sum as he might have recovered in a partition of the bonus between him and the remaindermen at the time the lease was executed. We have been unable to find any authority in support of this theory. It may be conceded that if the suit were by the life tenant, he would have had the right, upon setting aside the deed of January 10, 1923, to have a partition of the bonus and his life interest therein valued at a sum which, if then paid, would represent the interest or income from the fund during his life. Various methods for valuing in advance the life estate, where the corpus has been converted into money, have been applied by the courts, and in some states the matter is regulated by statute. See 21 C. J. p. 943. But we find no authority for applying any of these methods after the death of the life tenant. The real interest of the life tenant is the net value of the use of the property during his life. When the estate consists of money or is converted into money, the life tenant is entitled to have it invested in safe interest-bearing securities, and to receive the net sum earned as interest during his life. Barnes v. Keys, 127 P. 261, 36 Okl. 6, 45 L. R. A. (N. S.) 178, Ann. Cas. 1915A, 515; Blakley v. Marshall, 34 A. 564, 174 Pa. 425; Wilson v. Youst, 28 S. E. 781, 43 W. Va. 826, 39 L. R. A. 292. As long as the life tenancy exists, and its duration is uncertain, it is manifest that, to effect a fair partition of the two estates, it is necessary to resort to some method of determining the probable duration of the life estate and the present value of the use of corpus during such time. But every reason for resort to such methods ceases when the life tenant dies. The uncertainty of duration of the life estate, which was a necessary element in determining its value in advance, has ceased to exist. The life estate period has become definite and fixed, and the only thing remaining for ascertainment is the net value of the use of the corpus during that period. The net amount of the bonus was $57,500. It was paid January 21, 1923. N. H. Brown died June 8, 1923. For his life estate he received $1,000. If the deed by which he conveyed it be set aside his heirs at law are entitled to the net value of the use of $57,500 for 4 months and 17 days, less the sum of $1,000, which appellees paid for the life estate. At the highest rate of interest allowable by statute (10 per cent.) the bonus would yield $2,203.16; at the legal rate (6 per cent.) it would yield $1,322.50. These are gross sums, and if either rate be adopted the recovery would have to be reduced by the $1,000 credit. It will therefore be seen that the ultimate amount of recovery from appellees by the remaining seven heirs of N. H. Brown is less than $1,000. The record shows without dispute that the interest of appellees in the N. H. Brown estate is much in excess of the greatest amount that in any event they will have to account for to their coheirs, and for this reason we can see no valid ground for further impounding their funds in bank or charging their property with a lien.

[5] The trial court properly placed the burden of proof upon appellants to establish undue influence. There is nothing in the record which establishes as a matter of law such fiduciary relation between appellees and their father, N. H. Brown, as to bring the case within the rule announced in Goar v. Thompson, 47 S. W. 61, 19 Tex. Civ. App. 330.

[6] We also think the burden of proof properly placed upon appellants to establish that there had not been an equal division of the property of N. H. Brown prior to his death. The evidence shows that N. H. Brown had

made a division of the greater portion of his property among his nine children by giving to each approximately the same amount of land (in one instance the proceeds of the land). In the fall before his death he gave to each child (reckoning the Richie children as one unit) $500 in money. The appellants having attacked this division as being unequal, they assumed the burden of showing it so, under the general rule that the burden rests upon the party holding the affirmative of an issue or fact. See Boswell v. Pannell, 180 S. W. 593, 107 Tex. 438; Cameron Compress Co. v. Kubecka, 283 S. W. 285, and authorities cited in those opinions.

We overrule appellees' contention that the evidence was insufficient as a matter of law to raise the issue of undue influence. In view of another trial we will refrain from a detailed discussion or comment on the evidence. We may say, generally, however, that there is evidence to support a finding that N. H. Brown's physical infirmities, due to his advanced age (he was in his 83d year), had weakened his faculty of resistance to importunity, and that he was evidently under the impression that his only interest in the property was the royalties that might accrue during his lifetime. While there is no direct evidence of influence or pressure brought to bear upon him, there are a number of circumstances in evidence which would support undue influence as a reasonable and natural inference—and this aside from the mere opportunity and possibility of undue influence. But, were we inclined to hold the evidence insufficient upon this issue, we would not feel warranted in rendering judgment for the appellees in this regard, since the record does not necessarily show that this aspect of the case has been fully developed.

The charge of the court on undue influence is identical with that in the case of Shelton v. Shelton (Tex. Civ. App.) 281 S. W. 331. We sustain appellees' objections to this charge for the reasons stated in the opinion in the Shelton Case, to which we refer without reiterating the objections or reasons for holding them well taken. The opinion in that case will be a sufficient guide to the trial court in a further trial on this issue.

[7, 8] The other questions presented by the appeal have no substantial merit, and may be briefly disposed of. The record shows that Mrs. Nelia Brown, wife of W. A. Brown, had on deposit in one of defendant banks the sum of $1,200, and judgment was rendered in her favor against the bank for that amount. She requested a special charge calling for a verdict in her favor against the plaintiffs for 6 per cent. interest on this deposit from the date the bank was served with citation, "and such other damages as you believe that she sustained by reason of the actions of the plaintiffs, if the plaintiffs

have caused said bank to refuse to pay her said $1,200." Refusal of this charge is assigned as error. Aside from the fact that the requested instruction amounted to a general charge and was therefore properly refused, since the case was submitted on special issues (Railway v. Harrington [Tex. Com. App.] 235 S. W. 188), the mere fact that plaintiffs brought suit against the bank seeking to charge deposits in Mrs. Brown's favor with a trust, as the proceeds of the bonus, and the bank refused to pay Mrs. Brown's checks pending the litigation, would give to her no right of action against plaintiffs. They had a right to present their claims for adjudication, and the mere assertion of those claims did not create a cause of action. We overrule this assignment and like assignments presented by W. A. and S. H. Brown.

In the respect that the trial court's judgment is in favor of Mrs. Nelia Brown, and in the respect that it decrees the respective interests in the estate of N. H. Brown, deceased, and provides for its partition, it is affirmed. In all other respects that judgment is reversed and the cause remanded for further trial.

Affirmed in part, and in part reversed and remanded.