SHEPPARD et al. v. STANOLIND OIL & GAS CO.

No. 8791.

Court of Civil Appeals of Texas. Austin.

Feb. 15, 1939.

Rehearing Denied March 8, 1939.

Wm. McCraw, Atty. Gen., and John J. McKay, Asst. Atty. Gen., for appellants.

Clay Tallman, of Tulsa, Okl., and Tilley & Tocker, of Fort Worth, for appellee.

McCLENDON, Chief Justice.

Suit by the Stanolind (appellee, Stanolind Oil & Gas Company) against the State Treasurer, Comptroller and Attorney General to recover certain excise (oil production) taxes paid by the Stanolind upon demand of the Comptroller, into the "Suspense Account" of the State Treasury under protest and in compliance with the provisions of Vernon's Ann.Rev.Civ.St. Art. 7057b. The amount so paid represented the 2¾ cents per barrel gross production tax which the Comptroller asserted to be due the State upon that portion of the oil out of which, in addition to its royalty and cash bonuses, the State was to be paid certain stated sums, under two leases executed by the State in favor of the Stanolind as lessee. These leases were executed January 7th and 16th, respectively, 1935, under bids advertised for and received under V.A.R.C.S., Art. 5421c (Chap. 271, p. 452, Gen.Laws Reg.Ses. 42nd Leg., 1931). The first lease provided for a cash payment of $65,642.50, annual delay rentals of 25¢ per acre, a royalty of 1/6 on oil and gas, "and an additional $96,250.00 to be paid out of 1/6 of 5/6 of first oil and gas produced". The second lease provided for a cash payment of $36,750, a royalty of 1/6 on oil and gas, delay rentals of 25¢ per acre, "also an additional sum of $110,-000.00 to be paid out of 1/6 of 5/6 of the first oil and gas, if, as, when produced from the aforesaid area." A first lien was reserved in favor of the State on all oil and gas produced from the area "to secure the payment of all unpaid royalty or other sums of money that may become due under this lease." The judgment, from which this appeal is taken by the named State officials, was in favor of the Stanolind awarding recovery of the sums so paid.

The controlling question in the case is whether the State as to sums due it under the lease clause providing for payment out of 1/6 of 5/6 of the first oil produced from the lease is an interested party within the meaning of Subdivision (6) of Sec. 2 of Art. 7057a, V.A.R.C.S. If so such proportion of the tax is not a proper charge against the Stanolind, and the trial court's judgment should be affirmed. In other words, the question is whether such sums stand on the same footing as royalties as regards the tax, which latter were held not to be taken into account in computing the amount of the tax in Group No. 1 Oil Corp. v. Sheppard, Tex.Civ.App., 89 S.W.2d 1021,

and trustees of Cook Est. v. Sheppard, Tex.Civ.App., 89 S.W.2d 1026, error refused in both and the latter affirmed by the Federal Supreme Court, Barwise v. Sheppard, 299 U.S. 33, 57 S.Ct. 70, 81 L.Ed. 23.

The question presented turns upon a proper construction of the following subdivision of Sections 1 and 2 of Art. 7057a as applied to the fund in question:

"Section 1. (1). For the purpose of this Act, 'producer' shall mean any person owning, controlling, managing, or leasing any oil well and/or any person who produces in any manner any oil by taking it from the earth or waters in this State, and shall include any person owning any royalty or other interest in any oil or its value, whether produced by him, or by some other person on his behalf, either by lease, contract or otherwise. * * *

"(9). 'Royalty owners' shall mean and include all persons owning any mineral rights under any producing leasehold within this State, other than the working interest, which working interest is that of the person having the management and operation of the well. * * *

"(12). The Tax herein imposed on the producing of crude petroleum shall be the primary liability of the producer as hereinbefore defined, and every person purchasing crude petroleum from the producer thereof and taking delivery thereof at the premises where produced shall collect said tax imposed by this Act from the producer. Every purchaser including the first purchaser and the subsequent purchaser, required to collect any tax under this Act, shall make such collection by deducting and withholding the amount of such tax from any payments made by such purchaser to the producer, and remit same as herein provided. This Section shall not affect any pending law suit in the State of Texas, or any lease agreement or contract now or that hereafter may be in effect between the State of Texas or any political subdivision thereof and/or The University of Texas and any oil producer. * * *

"Section 2. * * * (3) The purchaser of oil shall pay the tax on all oil purchased and deduct tax so paid from payment due producer [or] on other interest holder, making such payments so deducted to the Comptroller of Public Accounts by legal tender or cashier's check payable to the State Treasury. * * *

"(6) The tax herein levied shall be borne ratably by all interested parties, including royalty interests; and producers and/or purchasers of oil are hereby authorized and required to withhold from any payment due interested parties, the proportionate tax due."

It is quite clear that the language in Sec. 1 (1), "* * * 'producer' * * * shall include any person owning any royalty or other interest in any oil or its value", is broad enough to include the State's interest in question. But it is contended by appellants that the interest of the State is such only of the holder of a vendor's lien upon the property conveyed as security for purchase money; that such sum constitutes a debt to be paid out of a particular fund, and does not even constitute an assignment of the fund or reservation of title or interest in the oil from which it is derived; that the statute divides "producers" into two classes (Sec. 1 (9)—royalty owners and those holding a "working interest" in a lease, the latter being defined as "that of the person having the management and operation of the well," and that the owner of the fund in question does not come within either class, it being but a bonus or additional consideration or purchase money for the lease. Additionally, appellants contend that if the statute be construed as applying the tax to the interest arising from ownership of such sums, it is unconstitutional for reasons stated below.

It may be conceded, at the outset, that if the sums in question constituted an absolute personal liability of the lessee secured by a retained vendor's lien upon the property conveyed by the lease, the legal and beneficial title to such property would pass in fee to the lessee for taxing and all other purposes except only as security for the purchase money debt and the incidental right of the lessor to cancel for breach of the promise to pay the debt. In this connection, appellants quote the following excerpts from Empire G. & F. Co. v. Pendar, Tex.Civ.App., 244 S.W. 184, 190, error dismissed:

"The consideration expressed in the contract was $60,000, [this includes the 30,000 oil bonus] which was to be paid by the lessee for a limited estate in the land of the lessor.

* * * * * * * *

"The judgment of the trial court is sustainable upon either of two theories, which lead to the same result: (1) That a party who agrees to pay a sum of money in a certain commodity which he is to produce and who fails to produce such commodity, is bound to pay the amount stipulated in money; and * * *."

It might be inferred from these isolated excerpts that the court there held that the sum payable out of production was a debt absolutely payable regardless of whether there was production. Such, however, is clearly not the holding. That suit was one for breach of an unconditional obligation on the part of the lessee to develop the property for oil. This is made clear from what follows the word "and" closing the above excerpts:

"* * * (2) if proof is necessary to show that the commodity could have been produced, the burden is upon the party breaking its agreement to show that, if the agreement had been kept, the commodity would not have been produced.

"In the specific case, appellant agreed to drill upon and develop the leased premises for the production of oil. Its obligation to that effect was not merely implied, but was express and definite. By the execution of the lease it acquired the exclusive right to do the only thing which would absolutely demonstrate whether oil could be produced from the property or not. It therefore not only assumed the obligation of testing the property, but it rendered it impossible for appellee to do so. The question therefore is, under such circumstances, whether appellant could be heard to say that if it had complied with the contract, oil would not have been produced in sufficient quantities to discharge its obligation; or, to put it differently, under such circumstances was the burden upon appellee to show that if appellant had kept its obligation, it would have produced the oil when appellant destroyed the only means by which such proof could have been absolutely made?"

█ It has been uniformly held in this State, and so far as our research has gone in other jurisdictions (see Thuss on Texas Oil & Gas, 2 ed., p. 94, Sec. 68), that an agreement to pay a stated sum out of oil or a percentage of oil or its proceeds produced from a given lease is conditional upon actual production. Harris v. Wheeler, Tex.Com.App., 267 S.W. 465; Ferris v. Huffman, Tex.Com.App., 274 S.W. 125. As stated by Chief Justice Cureton, in Ferguson v. Mansfield, 114 Tex. 112, 263

S.W. 894, 900: "It is quite elementary that an instrument payable upon a condition which does not import an absolute liability is not payable until that condition has happened."

The sole purpose of a mineral lease is to develop the property in order to produce the minerals, and where the consideration, in whole or in part, moving to the lessor is a sum stated payable out of production or a part thereof, the obligation thereby created is contingent upon the fact and extent of production. Of course, language might be employed in a particular instrument which would import an unconditional obligation to pay, as was the case in Bell v. Kirby P. Co., Tex.Civ.App., 269 S.W. 170.

█ It would therefore seem quite clear that the sums stated constituted the extent or limit of the State's right to be paid out of ⅙ of ⅚ of the first oil produced under the lease. If there were no production, no right to any payment would arise. If there were production the right to payment would be limited to ⅙ of ⅚ and to the amount of the first of such oil produced up to the value represented by the stated sum.

We are not here concerned with any question which might arise upon failure of the lessee to develop the property. It may be noted, however, in passing, that these leases provide for delay rentals and contain no obligation to develop, other than to drill offset wells should oil or gas be produced in paying quantities on property privately owned within one thousand feet of the leased area. This provision is manifestly to protect the oil in place from drainage.

Inherently, therefore, these sums possess every characteristic of the royalty payments, save only that the former are limited to the quantity of oil actually produced up to the amount equal in value to the stated sums. Both are conditional absolutely upon the fact of production, and both are limited to the amount of production; the former continuing so long as there is production, the latter ceasing when the production reaches the stated amount. For all practical purposes, and viewed in the light of every practical consideration, the interest of the State in the production of 1/6 of 5/6 of the oil, up to the full amount of the stated sums, is essentially and actually in nowise different from its interest under its retained royalty.

█ The term "bonus" is applied to sums paid or contracted as an additional consideration for a lease over and above the usual royalty. Where the bonus is paid in cash when the lease is executed, the lessor's interest in the property in so far as concerns the bonus is entirely extinguished. Having been fully paid he has no resultant interest in production. Where the bonus, though deferred, is absolutely payable the lessor's interest in the property on that account does not exceed that of a lienor. But when the bonus is conditional absolutely upon production, the interest of the lessor on that account is actual and real, wholly independent of whether he is secured in his right to payment from production or otherwise. The lien is merely security for the enforcement of the right to be paid out of production. It never becomes effective until the right to such payment arises; that is, until there is production.

█ In this state leases of this character are held to be conveyances of the mineral title in fee upon limitation. Consequently everything paid or contracted, whether in money or in oil or its proceeds, as distinguished from delay rentals, constitutes a part of the purchase price for the lease. In this particular the "oil bonus" (the term usually applied to the sums under consideration) stands upon the same footing as the cash bonus. But here the analogy between the oil bonus and money bonus (whether cash or deferred) ends. Royalty also is on the same footing as bonus, cash, deferred, or oil, as regards representing a part of the purchase price for the lease. And this is true for another reason: Oil in place is a part of the land. It constitutes real estate. When it is severed from the soil, the land itself is taken (wasted) to that extent, and the corpus of the estate in the land is to that exent depleted. Consequently anything which the lessor receives, in whatever form, in consideration for the oil taken or to be taken from the land, constitutes a part of the purchase price of the title to the oil, and therefore of the land. State v. Hatcher, 115 Tex. 332, 281 S.W. 192; Andrews v. Brown, Tex.Civ.App., 283 S.W. 288.

██ If it be conceded that Sec. 1 (9) of the statute divides those interested in oil production into two classes; "royalty owners" and those owning a "working interest", it does not follow that the owner of an "oil bonus" is excluded from those

648

owning an interest in production within the meaning of the statute. "Royalty owner", for the purposes of the statute, is therein defined and given a meaning, namely: that it "shall include all persons owning any mineral rights under any producing leasehold." While the expression "mineral right" is not defined in the statute, it would seem clearly to include that of any "producer", which the statute defines as including "any person owning any royalty or other interest in any oil or its value," without regard to whether it is actually produced by him or not. "The tax herein levied shall be borne ratably by all interested parties, including royalty interests." The statute manifestly lays the tax upon the owner of any character of direct or immediate interest in the oil actually produced, or in "its value," without regard to the title to the oil either before or after severance; and without regard to any arbitrary classification or nomenclature. We say direct or immediate to distinguish such interest from that of a mere lienor, whose interest is only collateral as security for a personal obligation of absolute liability.

 Bonus is merely a convenient term applied indiscriminately to consideration for the lease (whether in money or oil) over and above the usual royalty. Andrews v. Brown, supra. The usual royalty is ⅛. Applying this definition the difference between ⅛ and ⅙ would come within this definition of bonus. It might properly be termed a royalty bonus. And so it would be treated in determining the highest bidder under competitive bidding. Yet its nature is not thereby in any sense changed. It is just as much royalty in every sense of that word as the ⅛, except only that it is in excess of the usual in amount. This difference, however, could have no possible bearing upon the rights and liabilities of the parties and their respective obligations under the taxing laws. The expression "royalty bonus" would be but a convenient term to represent the royalty consideration for the lease over and above that which is usual. The oil bonus, as we have seen, partakes in every particular of the nature of royalty and royalty bonus, except only that its amount is limited. It is analogous to an overriding royalty. And such it would in fact be if, instead of moving to the lessor, it moved to the lessee under an assignment of the lease.

 If for the moment we disregard the State's position in the case, and assume that the issue here involved a lease between two private individuals, it it clear that the tax would fall upon the royalty owner to the extent of his interest, regardless of whether the royalty was payable in oil, out of oil, or in the value of oil. Cook Est. case, supra. And this is so because the royalty owner's interest in production is such as to make him an interested party and a "producer" within the meaning of the statute. The tax being laid upon him, it is payable out of his interest, and not by the lessee or owner of the working interest. The contract to pay royalty does not import an obligation to pay the production tax on the royalty interest which is laid by the State on the owner of that interest. In like manner, the contract to pay up to the full amount of the oil bonus "out of ⅛ of ⅚ of the oil first produced," does not import an obligation to pay the production tax upon such oil which the statute clearly levies upon the person owning the oil bonus, that is, the owner of the right to the oil, its proceeds, or its value.

We are quite aware of pronouncements in decisions, both of this and other jurisdictions, which would lead to a holding contrary to the above. The decisions have been quite fully and ably digested and analyzed by counsel for the respective parties. These present a number of irreconcilable views. This, however, is to be expected. The unprecedented development of the oil industry and the vast amount of capital invested in it has necessarily yielded a large harvest of litigation, resulting in a corresponding development in the law of oil and gas.

Much of the confusion arising from inconsistent pronouncements in earlier decisions of this State has been removed by the opinion in Sheffield v. Hogg, and Federal Royalty Co. v. State, 124 Tex. 290 77 S.W.2d 1021, 80 S.W.2d 741, the decisions and holdings in which we regard as controlling the instant case. That opinion was delivered by Mr. Justice Greenwood, on December 31, 1934, the last day of his long and eminent service on our Supreme Court. We deem it not inappropriate to observe that Judge Greenwood's contribution to the development of the law of oil and gas is monumental. His opinion in these last cases inherently manifests his thorough grasp of the subject, his wide

research in this field, and his painstaking consideration of the problems involved. Apparent is the consciousness of the importance and far reaching effect of the decisions; and expressed is the objective of setting at rest long controverted and perplexing issues of law affecting one of the greatest industries of the State. We have been unable to peruse the opinion, holding in mind the facts of the instant case, without concluding that the interest here involved, by whatever name it may properly be called, is an interest in real estate, an interest in production under the leases, and such an interest as imposes upon its owner the burden of the production tax under the statute we are considering. It is to be observed that the court had there under consideration several royalty clauses variously worded. The court also had in mind royalty clauses in leases not actually before it. It was the expressed purpose of the court to set at rest the question of the legal status of royalty by whatever wording granted or reserved and however payable—whether in the specific product (in oil) or in money measured by the value of the product. As we have pointed out above, there is no inherent distinction between royalty and the oil bonuses here involved, except only in the fact that the amount of the latter is limited to a fixed quantity of the production measured by its monetary value. This difference clearly could have no effect as regards its owner's interest in production.

Having reached this conclusion we deem it unnecessary to review the authorities in this or other jurisdictions which might have bearing upon the question before us, but for the conclusive effect of Judge Greenwood's above opinion and those in the two cases first cited above.

 Appellants' third proposition embodies the constitutional question above alluded to. It reads: "The judgment of the court has the effect of relieving the owner (the Stanolind Company) of the working interest in a State lease subject to an oil payment of the incident of the gross production tax on oil, whereas the incident of the tax universally falls on the owner of the working interest in private leases where such working interest is subject to an oil bonus. This situation thus creates an unfair advantage in favor of State lessees as against private lessees operating under the same type of leases."

This proposition is predicated upon the assertion that there is a universal custom or usage in Texas to the effect that, as regards oil bonuses, the holder of the working interest pays the tax, deducts the amount of the tax ·from the price received or value of the bonus oil, remits the net balance to the bonus owner, but takes credit on the bonus owner's account only for the net amount so remitted. The effect of such a custom or usage would be that the working interest owner would eventually bear the burden of the tax, if (as and when) the amount of the bonus oil production equaled the entire amount of the bonus plus the entire amount of the tax. Should the production fall short of such gross amount the bonus owner ·would bear the burden of the tax to the extent of such shortage.

The evidentiary basis for this asserted universal custom or usage rests in the testimony of an employee of the Comptroller's department. We have carefully perused this testimony and we are unable to draw from it the construction which appellants seek to give it. To say the least, the testimony is quite vague and obscure. Moreover, if susceptible of the claimed construction, the practice was not shown to be universal. We hold, therefore, that the proof does not support the allegation. If such custom or usage existed and it was universal in the oil industry, it would not be difficult of satisfactory proof.

We might add that it would be a strange custom that on the one hand would lay the burden of the tax upon the bonus owner when the amount of production was insufficient to pay the full amount of the bonus plus the tax; and on the other hand would lay the tax burden on the working interest owner when the bonus oil production equaled or exceeded such full amount. Such custom could not be predicated upon a construction of the lease contract as including the tax as a part of the cost of production to be borne by the working interest owner; for, in such event, it would never be deducted ·from the proceeds of the bonus oil. Moreover, such construction would apply with equal force to royalty interests, which have been judicially determined to be chargeable with the tax.

We have not deemed it necessary to consider the question whether proof of the alleged custom or usage would be admissible to give a meaning to the instruments

involved at variance with the legal effect of their express terms.

The trial court's judgment is affirmed.

Affirmed.