[L. A. No. 14354. In Bank.—June 27, 1936.]

LEE D. MEYERS et al., Plaintiffs and Appellants, v. THE TEXAS COMPANY, Defendant and Appellant.

612

Hanna & Morton, Raymond J. Kirkpatrick, Byron C. Hanna and Harold C. Morton for Plaintiffs and Appellants.

Michael F. Shannon, Thomas A. Wood, Robert H. Dunlap, Wm. M. Abbott, Overton, Lyman & Plumb and William R. James, as *Amici Curiae* on Behalf of Plaintiffs and Appellants.

Charles C. Stanley, J. A. Tucker and R. K. Barrows for Defendant and Appellant.

Robert M. Searls, Wm. F. Kiessig, Paul M. Gregg, L. W. Andrews, A. V. Andrews, A. L. Weil, McCutchen, Olney, Mannon & Greene and Pillsbury, Madison & Sutro, as *Amici Curiae* on Behalf of Defendant and Appellant.

THOMPSON, J.—The plaintiffs brought this action to impeach the accounting of defendant covering the period from September 9, 1924, to June 30, 1930, as lessee under an oil lease, and recovered judgment in the sum of $116,710.39. Both plaintiffs and defendant have appealed, the defendant from that part of the judgment which awarded plaintiffs a sum representing the quantity and gravity of royalty oil not accounted for, and the plaintiffs from that part of the judgment which denied them recovery of additional sums for casinghead gasoline royalty. We shall first dispose of the defendant's appeal.

The lease covered a ten-acre parcel of land in the Huntington Beach oil field and provided for a one-sixth royalty to lessors, which might, at lessor's option, be taken in kind, and, if they did not so elect, the lessee was authorized, according to the provisions of paragraph III-g of the lease, "to handle, market, sell and/or otherwise dispose of said royalty oil, with and as a part of the products belonging to the lessee, and pay to the lessors in money, *the proceeds thereof*, less cost of handling after leaving tank or container". (Italics ours.) Section I-1 of the lease reads as follows: "That it will at the request of said lessors, market in its original state the royalty oil or gas belonging to them, along with and upon the same terms as it markets its own oil or gas produced upon said premises, and pay to said lessors the proceeds therefrom, less the cost of handling after leaving the tank or container, but in no event shall it pay lessors less than the Standard's posted market price." The lessors at no time elected to take this royalty in kind. Rather, on September 9, 1934, the defendant then being known as and operating under the name of Petroleum Midway Company, Ltd., wrote plaintiffs as follows:

"Referring to the *Vollmer-Meyers* oil lease in the *Huntington Beach* field, now being operated by this company and of which you are one of the owners.

"You are hereby advised that the oil being produced from this lease contains such quantities of water and other foreign substances and is of such character as to render it necessary to treat same to make it marketable. The undersigned has erected a plant in the *Huntington Beach* oil field for the treatment of its own oil. The lease provides that in the event the lessee erects a plant for the purpose of treating such oil, it will, upon request, transport and treat the royalty oil of the lessors together with its own, charging therefor the actual cost of such transportation and treatment.

"If you advise us to transport and treat your oil with ours, please sign the enclosed request and return same to us at once.

"As there is no market for this oil until it has been treated, we will, until advised by you to the contrary, transport and treat your oil with ours, charging you your proportion of the actual cost therefor."

The letter refers to paragraph I-k of the lease, which reads: ''That it (lessee) will, in the event it becomes necessary to treat any of the oil produced on said premises to make same marketable, and in the event the lessee erects a plant for that purpose, upon request, treat the royalty oil of the lessors together with its own, charging therefor only the net cost of such treatment.'' For the period here involved, the oil was so treated at defendant's plant, in common with oil from other properties, and, after being cleaned, either was sold by defendant or sent to its own refinery. The trial court concluded from its interpretation of the lease, under the circumstances in which the oil of lessors was handled and marketed, that defendant was obligated to account to plaintiffs for a one-sixth of the proceeds resulting therefrom. With respect to the claim of plaintiffs that defendant had not accounted for the proceeds of the full quantity of the oil, the court awarded plaintiff, as a part of the total judgment, the sum of $42,545.47, together with interest thereon in the sum of $13,504.69. This amount was arrived at by accepting the figure of 35 per cent of the ''cut'' (the amount or percentage calculated to be basic sediment and water) of the wet oil as recoverable oil, and was based upon testimony to the effect that the method of sampling followed by the defendant, together with the testing thereof by the benzol method, did not reflect the true quantity of recoverable oil, but that, instead, from 30 to 70 per cent of the ''cut'' would be recovered. One witness declared that the method of sampling, aside from the testing, would result in an error of ''at least half to one third of the cut.'' The method of sampling followed by defendant during the period involved is what is known as the ''three point'' method, which simply means that samples are taken from the tank at the bottom, the middle and the top. There was abundant testimony, as already indicated, that this method, although approximately correct when applied to dry or clean oil (oil containing less than 3 per cent basic sediment and water) is inaccurate when applied to wet oil. The proper method is known as ''core'' sampling, by which a core is extracted from the tank and reflects its true character. The court found that the methods of sampling and testing applied in determining the quantity of water and foreign substances in the oil produced were not those in general use by oil operators in the field

in which the leased premises were situated, and that many other companies used the correct and accurate methods referred to in the findings. There can be no doubt that, in so far as sampling is concerned, the finding is amply justified by the evidence, and, although the specific finding is not attacked, we might doubt the implied reference to the method of testing by benzol or carbon bisulphide during the period here in question, if the method were involved in the purchase of oil, but, as we have already observed, the trial court proceeded upon the theory that defendant here was bound to account for the proceeds of the oil, rather than being obligated to purchase.

Assuming that the lease agreement is ambiguous in this particular, we are not inclined to, and should not, where a question of facts enters into the construction, depart from the interpretation put upon it by the trial court. (*Adams* v. *Petroleum Midway Co.*, 205 Cal. 221 [270 Pac. 668]; *Whepley Oil Co.* v. *Associated Oil Co.*, 6 Cal. App. (2d) 94 [44 Pac. (2d) 670]; *Kautz* v. *Zurich General A. & L. Ins. Co.*, 212 Cal. 576 [300 Pac. 34].) It seems obvious, however, that plaintiffs either had the right to demand a one-sixth part of the oil after dehydration and their payment of a one-sixth part of the cost or, in the event the whole was handled and marketed by defendant, to a one-sixth of the proceeds.

The appellant asserts that the part of the judgment rendered to represent the quantity which defendant should have accounted for is not supported by the evidence. Its argument in this respect, however, is largely addressed, in its last analysis, to the weight of the evidence and hence is not a proper subject of inquiry by this court. In this regard, it argues that the court could not properly conclude that 35 per cent of the "cut" was recoverable, because of the variable factors such as "time allowed for settling", "temperature and viscosity", "size of water droplets", "effect of dissolved gas", "bleeding" and "irregularities in sampling", which tend to increase or minimize the error. It is first to be noted that the trial court, in adopting 35 per cent of the "cut" as the general average error, determined upon a figure within 5 per cent of the minimum error and less than the maximum by an additional 35 per cent. It thus appears that the court considered the factors mentioned

and, in order to exclude them from affecting the judgment, adopted a percentage near the minimum. Furthermore, the evidence supports the plain findings of the court that defendant did not account for the full quantity of the oil and that it could have accounted for the full quantity. It cannot, under such circumstances, escape liability, because the loss to plaintiffs is not now capable of exact proof. (*Shoemaker* v. *Acker*, 116 Cal. 239 [48 Pac. 62]; *Sobelman* v. *Mairer*, 203 Cal. 1 [262 Pac. 1087].)

■ The second claim of plaintiffs in the trial court was that defendant had not accounted for the true gravity of the oil but had, in fact, consistently reported a lower gravity, or oil of a lesser market value. The trial court agreed with this contention and found that from August, 1924, until July, 1928, the true gravity was 28 degrees and, from July, 1928, until July, 1930, it was 27 degrees or higher, while defendant accounted for oil ranging between 26 and 14 degrees. The court went further and found that one of the wells on the property produced dry oil, and yet defendant mixed it with wet oil from other wells and accounted on the basis of the gravity of the mixture. Here again appellant makes an argument which goes to the weight of evidence and which should have been and probably was addressed to the trier of facts. It is sufficient to say that the testimony introduced is sufficient to support the findings.

In reality, the defendant proceeded upon the theory that it was bound to account only for the market value of the wet oil, instead of the proceeds. This is made doubly certain by a concession in appellant's brief that it changed its methods on July 1, 1930, because "the percentage of water in the oil had become so great that the market value no longer constituted a reasonable price for the wet oil". As we have already seen, however, the court adopted an interpretation of the provisions of the lease opposed to that of appellants, and we are of the opinion that it may be so construed. But, even if we were to adopt appellant's interpretation, it is doubtful if it could prevail, because, calculated upon the theory of purchase, it should have accounted on the basis of the Standard Oil Company's posted price, and the evidence discloses that the latter company cleaned the oil before sampling and testing.

■ We are thus brought to the point where we can consider the special defenses interposed by the appellant. It is alleged that the monthly statements rendered by defendant and not questioned by plaintiffs until demand was made for an accounting preliminary to the commencement of this action constitute an "account stated", an "account settled", "accord and satisfaction", and finally that plaintiffs are estopped to deny the correctness of the accounts rendered. It is also urged that the action is barred by the statute of limitations. As we view the case, all these contentions are disposed of by a proper construction of the pleadings, evidence and findings. It is alleged and found that the plaintiffs, unskilled in matters pertaining to the operation of oil wells and the handling, measuring and marketing of the products therefrom, relied upon the defendant for correct statements, and that the defendant, knowing that plaintiffs, by reason of their total lack of knowledge of things pertaining to accounting for oil and of their confidence and faith in defendant, was able to and did intentionally deceive the plaintiffs by rendering reports which were in fact not true, and further did appropriate to itself moneys rightfully belonging to plaintiffs. It is further found that plaintiffs, by reason of their lack of knowledge and unfamiliarity with such matters, could not have discovered the facts for themselves, except by the employment of experienced persons, and that they did not in truth discover the situation until 1930. As indicative of the knowledge on the part of defendant that it was in fact recovering a much greater share of the oil than was being reported to the lessors, attention may be directed to two significant bits of testimony. In 1926, the manager of production discussed with the executive committee of defendant the advisability of turning over to the producing department the cleaning of the oil, because he wanted credit for the oil recovered. He told them that it was customary for the producing department to run the oil on a dry basis and referred to the Standard Oil Company as an example. Again, in 1929, this same official had prepared a report which estimated the amount of oil recovered from the emulsion covering the month of November, and it appears therefrom that it was calculated that the oil recovered by the defendant by dehydration in the Los Angeles basin would amount to $330,486.24 per annum. Ref-

erence is also made to the fact that three point sampling, while satisfactory when applied to ''dry'' oil, is always erroneous where ''wet'' oil is involved. This report was transmitted by letter to his superior for their ''own information'' and was ''of course confidential''. The letter also refers to the fact that the ''question has been discussed from time to time by various officials of the company''. Obviously, therefore, it is the theory of the complaint and the findings that the defendant concealed facts from the plaintiffs and induced plaintiffs, by its concealment and representations, to accept statements which were not true. █ It is a rule well recognized that, where the account has been accepted as the result of any mistake or fraud or undue advantage, a court of equity will not suffer it to defeat the rights of the innocent party, but will allow it to be opened and examined. (*Vance* v. *Supreme Lodge of the Fraternal Brotherhood,* 15 Cal. App. 178 [114 Pac. 83] ; 1 R. C. L. 216.) When we note the additional fact that the complaint was filed March 20, 1931, or well within the time after it is found that plaintiffs discovered the concealment, it is obvious that all of the special defenses must fall.

█ It is, however, argued by the appellant that the court erred in allowing interest, because demand was not proved and because the damages were not capable of being made certain by calculation. We cannot agree with appellant in this regard. The true rule in equity is that every man is bound, not only to perform his obligation, but to repair all damage that naturally flows from his failure so to do. (*McCowen* v. *Pew,* 18 Cal. App. 482 [123 Pac. 354] ; *Hansen* v. *Covell,* 218 Cal. 622 [24 Pac. (2d) 772, 89 A. L. R. 670].) Or, to put it in other words, since this was an action to impeach the accounting of defendant for the deliberate concealment of the quantity and quality of oil, the court was justified in applying equitable considerations in its determination of the problem. When it found that defendant in effect deliberately appropriated moneys belonging to plaintiffs from time to time, it was within its discretion to allow plaintiffs interest to cover the period of withholding. (*McCowen* v. *Pew, supra.*) The only reason for uncertainty results from defendant's failure properly to account.

It seems unnecessary, in view of what has been said, to point out the difference between this case and that of *Alamitos*

*Land Co.* v. *Shell Oil Co.,* 3 Cal. (2d) 396 [44 Pac. (2d) 573], but because of the insistence that it should govern the disposition of this case, we have concluded to call attention to the fact that in the Alamitos case the lease provided for the "purchase of oil" by the defendant, whereas, in the present case, the defendant, under the facts, was bound to "pay the lessors in money *the proceeds thereof,* less cost of handling after leaving the tank or container". Other differences have also been observed, such, for instance, as the fact that in the Alamitos case, no complaint was made concerning the method of sampling. To our minds, however, the controlling factor in each case is found in the contract of the parties.

█ We may now turn to a consideration of the appeal of the plaintiffs from that part of the judgment which denied them a greater recovery for their royalty or share of casing-head gasoline. The claim that they did not receive sufficient in this behalf is grounded upon the proposition that they should not have been charged with any part of the depreciation of the gasoline extraction plant, or insurance, or administration or bookkeeping expenses and taxes. They contend that the finding of the court that the above items were part of the cost of extraction is not supported by the evidence. The lease does not obligate the defendant to extract gasoline from the natural gas, but, if it does, it must pay to lessors one-sixth of the proceeds "after deducting the cost of extraction". It is immediately to be observed, therefore, that the possible extraction of gasoline was only an incident to the main undertaking, and separate and apart therefrom, presumably dependent upon whether, under the circumstances of the production of the natural gas, its quantity and quality, and the cost of extraction, it could be made profitable for all parties. For the purpose of arriving at the intent of the parties, we can assume a situation where, if the items mentioned are not to be deducted as a part of the cost of extraction, the profits would not justify the lessee in extracting the gasoline, as a result of which, under its option, the lessors would receive no return, whereas, if they are to be deducted, a fair return may inure to both.

█ We agree with appellants that the word "cost" is a word of variable meaning and that it must be construed according to the circumstances in which it is used. A review

of the authorities is of little value, except to illustrate the fact just stated that, in order to arrive at thé intent with which it was used in the particular case, the word is to be construed in the light of all attending circumstances. So here, it seems to us manifest that all of the cost of extraction was to be deducted before a division of the proceeds should be made. This was the view entertained by the trial court. It cannot seriously be argued, because plaintiffs were unfamiliar with the manner of conducting the oil business and the extraction of gasoline and, for that reason, did not contemplate all the expense attendant upon such extraction, that their belief should be allowed to govern its interpretation. It is not contended that the amounts of the various items are improper. In fact, the amount of depreciation was stipulated. The contention, therefore, of the plaintiffs must be denied.

The defendant appellant has called attention to an error of computation in the judgment, and the same is conceded by the plaintiffs, whereby defendant was inadvertently denied $1909.85, a part of the cost of dehydration and interest thereon.

The conclusions to which we have come reveal that there is no necessity for the taking of additional testimony, in accordance with the petition of plaintiffs. It is, therefore, denied.

The judgment is modified by deducting therefrom the sum of $1909.85 and, as so modified, it is affirmed, and the parties herein will bear their own costs on appeal.

Waste, C. J., Shenk, J., Seawell, J., Curtis, J., and Langdon, J., concurred.

Rehearing denied.