[Civ. No. 15501. Second Dist., Div. Three. Mar. 29, 1948.]

TRANSPORT OIL COMPANY (a Corporation), Appellant, v. EXETER OIL COMPANY, LTD. (a Corporation), Respondent.

Victor Ford Collins for Appellant.

Elmer P. Bromley and John D. Maharg for Respondent.

SHINN, Acting P. J.—This is an appeal by Transport Oil Company, herein called Transport, from a judgment denying it damages against Exeter Oil Company, Ltd., herein called Exeter. The action arose as a consequence of Exeter's abandonment, in January 1942, of a certain oil leasehold located in the Signal Hill oil field at Long Beach, California, and of Exeter's agreement to operate the property for Transport.

The basic lease to this property was executed in 1921 to one Stutts as lessee. It required the lessee to do certain drilling on the property, which has been done, and to pay a 16⅔ per cent royalty to the lessor, based on gross returns. The

habendum clause provided: "The Lessee shall hold said land hereunder, for the period of twenty (20) years from, and after, the date hereof.and as long thereafter as oil or gas is produced in paying quantities unless otherwise forfeited by Lessee in accordance with the terms of this lease." In reference to the lessee's obligation to operate the leasehold, the lease stated, "If they shall so elect, drilling or pumping operations hereunder shall be suspended while, but only so long as, the Lessees are prevented from work by reason of strikes, lockouts, acts of God, unavoidable accidents or other methods beyond the control of the Lessees, or when the price of oil falls to or below the sum of Fifty Cents (50¢) per barrel at the well."

By means of successive assignments, Transport became the lessee. These various assignments reserved certain overriding royalties which Transport assumed.

On July 29, 1936, Transport entered into an operating agreement with Bacon and Bailes, who subsequently assigned to Exeter in 1937. Exeter assumed the obligations of the agreement and operated the property until it was abandoned. Transport's action is predicated upon a claimed breach of this operating agreement by Exeter.

The material provisions of the agreement are as follows: the operator was required to drill one new well, and to redrill or otherwise recondition certain existing wells. This was done, and at the time of abandonment three wells, designated No. 1, No. 2, and No. 5 were in production. The agreement provided further than the operators "shall with reasonable diligence and in good faith pump and otherwise operate and care for all wells drilled by them upon the said lease at all times so long as they shall remain in possession of the same so that the full production thereof may be obtained," etc. Finally, the agreement provided: "The parties of the second part (operators) hereby assume and agree to perform, each, every and all the duties, liabilities, covenants, agreements and obligations of the lessee under the lease hereinabove described, and of the party of the first part under said lease and the assignments thereof," etc. For the limited purposes of our decision Exeter should be deemed the lessee under the basic lease.

The royalty obligations assumed by Exeter as assignee of this operating agreement were the following: the 16⅔ per cent royalty called for by the basic lease; the overriding royalties, by reason of the assignments of the basic lease, amounting to 14 per cent, respectively, on wells No. 1 and No. 5, and 15 5/6 per cent on well No. 2; and the additional royalties

reserved by Transport in the operating agreement, amounting to 20 per cent on wells No. 1 and No. 2, respectively, and 12½ per cent on well No. 5. Thus Exeter was required to pay total royalties of 50⅔ per cent on well No. 1, 52½ per cent on well No. 2, and 43 1/6 per cent on well No. 5.

For many years prior to 1942, production of oil from the premises had been suffering an increasing and expected decline due to natural causes. In the latter part of 1941, Exeter sought unsuccessfully to negotiate a reduction in the amount of its royalty obligations. These efforts failing, in January, 1942, Exeter abandoned the property, moved off all the equipment, and plugged and cemented off the wells according to legal requirements. No notice was ever given to Transport of intention to abandon the leasehold.

Under these circumstances, the abandonment by Exeter of performance under the operating agreement was also an abandonment of the lease, causing its forfeiture to Transport's lessor. In addition to damages claimed for the loss of the lease, Transport seeks to recover the value of the equipment removed by Exeter and allegedly converted in violation of a liquidated damages provision of the operating agreement. Exeter's defense, successful in the court below, is that the operation had become unprofitable, in that, oil or gas could no longer be produced in paying quantities, and that therefore the lease had by its own terms expired prior to January, 1942. Thus, it is urged, Exeter acted squarely within its rights under the operating agreement in abandoning the leasehold and in removing the equipment for its own use. The question before the court is whether the abandonment was justified in view of Exeter's obligations.

The operating agreement itself contains no provision for cessation of operations or abandonment in case the leasehold could no longer be operated profitably. However, the lease, as we have seen, obligated the lessee to hold and operate the property "for the period of twenty (20) years from and after the date hereof and as long thereafter as oil or gas is produced in paying quantities." Since the lease was dated October 25, 1921, the fixed term had expired prior to the time of abandonment. The answer to the essential question of whether or not the lease had expired is thus seen to turn on whether or not production was in paying quantities at the time Exeter terminated its operations.

The lease contains no definition of what would be considered a paying operation unless such definition can be found

in the following provision: "For all purposes herein contemplated, a well shall be deemed to be producing oil in paying quantities when such well, operated in a diligent and skillful manner, will produce oil or gas or both of a value at the well of $15.00 per day or more in excess of the reasonable cost of the fuel, labor, supplies and material required in the operation of such well." Exeter contends that this definition applies to the entire operation, that in the year 1941, none of the wells was making a net revenue of $15 per day, and that the lease was therefore terminable by either party thereto on that ground. The trial court concluded that the express $15 per day definition governed, but that if this provision were to be disregarded, the operation was nevertheless unprofitable.

There being no extrinsic evidence in aid of the construction of the instrument, this court is not bound by the trial court's interpretation and will independently ascertain the meaning of the instrument's provisions from the language thereof as a matter of law. (*Trubowitch* v. *Riverbank Canning Co.*, 30 Cal.2d 335, 339 [182 P.2d 182]; *Moore* v. *Wood*, 26 Cal.2d 621 [160 P.2d 772].)

Exeter places reliance upon the introductory words of the quoted definition, "for all purposes herein contemplated." Upon analysis, however, we are persuaded that these words referred solely to the development obligations of the lessee, and were not intended to operate as a limitation upon the habendum. The lease contemplated the drilling of one well on the north half of the property, with a privilege granted to the lessee of drilling a second one on the south half. The duty to drill the first well was limited to a depth of 3,500 feet, "unless oil, in paying quantities shall have been obtained at a lessor [sic] depth." Furthermore, a cash bonus was to become payable only "in the event oil is obtained in paying quantities in the well so drilled on the north half of said Lot Three." And finally, the lessee's obligation to pay royalties was not to commence until "after the discovery and production of oil in paying quantities from said well." It will be noted that all three of these provisions refer in terms to an individual well rather than to the leasehold as an entirety. Similarly, the express $15 per day definition sets forth the circumstances as to production and expense of operation under which a single well is to be considered as producing in paying quantities, whereas the habendum clause defines the temporal duration of the lease as a whole. A grammatical reading would thus lead to the conclusion that the express

definition was in no way intended to modify the habendum, but was rather designed to specify the extent of the development and payment obligations of the lessee.

In the evolution of oil and gas leases, the paying quantities phrase has come to have two entirely different meanings. In the habendum it serves to perpetuate the lease beyond the fixed term for as long thereafter as it would be mutually profitable to the parties. (See 2 Summers, Oil and Gas (perm. ed.), §§ 287, 306; *Benedum-Trees Oil Co.* v. *Davis*, 107 F.2d 981; *Union Gas & Oil Co.* v. *Adkins*, 278 F. 854.) A different function is performed where the term appears in the development provisions, for there it operates primarily for the benefit of the lessee, as a limitation upon his obligation to drill and pay royalties. In view of this dissimilarity of purpose, application of the express definition equally to both provisions would do violence to the rule that such leases are to be construed in accordance with their reasonable and common sense meaning. (Civ. Code, § 1643; *Irvine* v. *MacGregor*, 203 Cal. 583 [265 P. 218].)

A simple illustration will demonstrate the unreasonableness of Exeter's interpretation. Each well on the lease might have been producing a net revenue of $5,000 per year, rendering the lease extremely valuable, with no single well producing a net of $15 per day. Certainly the parties never contemplated that under such circumstances either the lessor or the lessee should have the right to terminate the lease. Again, the inclusion in the lease of the provisions quoted above, obligating the lessee to continue operations, except in certain contingencies not here involved, provides support for our view that all producing wells, regardless of their individual profitability, were to be kept in continuous production as long as the operation, considered as a whole, was in paying quantities. The lessor would thereby be assured of receiving maximum royalties, which were to be computed on the basis of gross returns. In any event, the express definition must yield to the general intent of the contract. (Civ. Code, § 1650.) Accordingly, we hold that the effect to be given to the term, "paying quantities," in the habendum is not governed by the $15 per day definition, but is to be determined by reference to the established legal meaning of the term.

Our next inquiry is whether the trial court correctly concluded that the leasehold was not producing in paying

quantities, even within the meaning of the established legal definition of that term. By the great weight of authority, the term, "paying quantities," when used in the extension clause of an oil lease habendum means production in quantities sufficient to yield a return in excess of operating costs, even though drilling and equipment costs may never be repaid and the undertaking considered as a whole may ultimately result in a loss. (*Walden* v. *Potts,* 194 Okla. 453 [152 P.2d 923] ; *Denker* v. *Mid-Continent Petr. Co.,* 56 F.2d 725 (C.A.A. 10th) ; note 84 A.L.R. 756.)

Exeter's contention, with which the trial court agreed, is that for the year 1941, the operation was conducted at a net loss of more than $100, and in the month preceding abandonment, at a net loss of more than $700. In computing operating costs, Exeter includes as part of cost all royalties, including those payable to Transport, and also all cost of maintenance of the three wells here involved. Transport, on the other hand, contends that the royalties payable to it should not be included as an operating expense, but apparently concedes that all other royalties should be taken into account.

A careful reading discloses that nowhere in the operating agreement is there to be found any provision that in determining whether the lease has expired, overriding royalties, or any royalties other than the 16⅔ per cent payable to the landowner, should be treated as an expense of operation, nor is there particular reference to the landowner's royalty. However, each assignee of the lease assumed the lessee's obligations to the landowner. Exeter assumed them, as we have seen. Neither the operating agreement nor the assignments purported to affect in any way the duration of the lease or the method of calculating its date of termination. It would seem clear, then, that the operation was to be considered profitable and the lease still operative as long as oil and gas could be produced in paying quantities by a lessee who was required to pay only the basic royalty of 16⅔ per cent as an expense of operation.

Stated in a somewhat different fashion, we find Exeter carrying a dual set of obligations. (See 8 Cal.Jur. (Supp.) "Oil and Gas," § 141.) In respect to Transport, it was, of course, required to comply with the terms of the operating agreement; in respect to the landowner, having assumed the leasehold obligations, it occupied the same position as the original lessee. (*Bessho* v. *General Petroleum Corp.,* 186 Cal. 133, 138 [199 P. 22].) Consequently, as between Exeter

and the landowner, the lease would endure, and Exeter would be obligated to continue to operate the wells, as long as Exeter received a sufficient net return to justify operation of the lease, after paying operating costs and the landowner's 16⅔ per cent royalty. The Transport and other overriding royalties, being obligations incurred by Exeter under the operating agreement alone, cannot properly be considered in determining Exeter's duties under the basic lease.

 Turning to Exeter's own figures, which are stipulated by the parties to be correct, we find that when the overriding royalties, including those payable to Transport, are excluded as an operating expense, the total operation resulted in a profit, for 1941, of about $4,300, before reserves for depletion and depreciation, which were not shown. Regardless of the status of depletion in the calculation of taxable income (*Dakota-Montana Oil Co.* v. *United States,* 59 F.2d 853, such charges are clearly not to be considered a cost of operation for present purposes, nor has it been seriously contended that they should be. There is room for argument, however, that depreciation might reasonably be treated as an operating cost. (See *Meyers* v. *The Texas Co.,* 6 Cal.2d 610 [59 P.2d 132]; *United Central Oil Corp.* v. *Helm,* 11 F.2d 760, cert. den. 271 U.S. 686 [46 S.Ct. 638, 70 L.Ed. 1151].) Even so, on the record before us, the result would not be changed, for a substantial profit would remain after deducting depreciation, according to the depreciation claimed by Exeter for the year 1940. Under the generally accepted definition of paying quantities, then, it is clear that this leasehold was a successful operation in 1941.

Furthermore, Exeter's alternative contention, that a substantial net loss incurred in December, 1941, the month preceding abandonment, had caused the lease to terminate, may not be sustained. It may be conceded that even when the overriding royalties, including Transport's, are disregarded as a cost of operation, the net loss amounted to more than $470 in this one month. This figure, however, is an insufficient basis for a finding that the leasehold was not producing in paying quantities. It is to be expected that a highly profitable lease may be operating at a loss temporarily. The present case amply illustrates the point, for the net loss in December, 1941, was chiefly due to unusually high maintenance costs in that month. A similar experience was had in several previous months. In the absence of compelling reasons to the

contrary, the profitability of a lease should, where possible, be determined over a relatively long-term period, so that expenses subject to wide fluctuations may be exposed to the leveling influences of time. (Cf., *Denker* v. *Mid-Continent Petroleum Corp., supra,* 56 F.2d 725.) ▮▮▮ Under the circumstances here presented, the monthly basis appears inadequate to provide a reasonably accurate financial picture as to the profitability of production. The annual figures do not share in this deficiency. The loss for the month of December, 1941, is thus immaterial in view of the substantial profit realized for the entire year 1941.

We hold therefore that the basic lease had not yet terminated in January, 1942, and the abandonment at that time by Exeter was in violation of the operating agreement and the lease.

The judgment is reversed for a retrial of the sole issue of damages, if any, suffered by plaintiff.

Wood, J., and Vallée, J. pro tem., concurred.