MORRISS et al. v. FIRST NAT. BANK OF MISSION et al.

No. 12352.

Court of Civil Appeals of Texas. San Antonio.

March 26, 1952.

Rehearing Denied May 28, 1952.

Tarlton Morrow, Vinson, Elkins &
Weems, Houston, Sawnie B. Smith, Edin-
burg, Robertson, Jackson, Payne, Lan-

caster & Walker, A. W. Walker, Jr., Dallas, for appellants.

Gauis G. Gannon, Houston, Earl A. Brown, Sam H. Field, Dallas, for appellees.

POPE, Justice.

This is an interpleader suit brought by the First National Bank of Mission, Texas, as depository for certain funds payable under an oil and gas lease, to determine whether the funds in dispute are royalties that belong to the non-participating royalty owners as a "minimum royalty," or rents or bonus payable to the lessor who owned the leasing or executive rights. The suit is also for a declaratory judgment. The trial court without deciding that the funds were rents or bonus, decided that they were not royalties.

On March 15, 1944, Santa Cruz Farms Company executed an oil and gas lease to Magnolia Petroleum Company on a large tract of land. A resolution of the board of directors of the lessor, Santa Cruz Farms Company, was attached to and recorded with the lease, and it empowered the corporate officers to make the lease "for an agreed consideration of Five Dollars ($5.00) per acre, said lease to be a primary term of ten (10) years and as long thereafter as oil, gas or other minerals is produced therefrom, and to provide (sic) for a delay rental of Two Dollars ($2.00) per acre during the primary term, and for a minimum royalty of Two Dollars ($2.00) per acre during the primary term and thereafter of One Dollar ($1.00) per acre * * *."

Paragraph 2 of the lease provides that it is for a primary term of ten years "and as long thereafter as oil, gas or other mineral is produced from said land * * *." The other pertinent portions of the lease are:

"3. The royalties to be paid by Lessee are: (a) on oil, one-eighth of that produced and saved from said land, same to be delivered at the wells or to the credit of Lessor in the pipe line to which the wells may be connected; (b) on gas, one-eighth of the proceeds from the sale of the gas, as such at the well for gas from wells where gas only is found, and where not sold shall pay Fifty ($50.00) Dollars per annum *as royalty* from each such well, and while *such royalty* is so paid, such well shall be held to be a producing well under paragraph two hereof. The Lessee shall pay to Lessor for gas produced from oil well and used by the Lessee for the manufacture of gasoline or any other product, one-eighth of the market value of such gas, or if said gas is sold by the Lessee, one-eighth of the proceeds of the sale thereof; * * *

"4. If oil, gas or other mineral is not being produced from said land or land pooled therewith on or before March 15, 1945, this lease shall terminate as to both parties unless on or before that date Lessee shall pay or tender to Lessor the sum of Fifteen Thousand Nine Hundred Forty-two and no/100 Dollars ($15,942.00), as a rental. The payment or tender so made shall have the effect of maintaining Lessee's rights in the land for a period of 12 months from said date without further payments or operations of any kind for the production of oil, gas or other minerals from said lands for one or more successive periods of 12 months each, not to exceed, however, 10 years from the date of this lease. Such payments or tenders may be made to the Lessor or to the First National Bank of Mission, Texas, which bank, or any successor thereof, shall continue to be the agent for the Lessor and Lessor's successor's and assigns. * * *

"9. The covenants of Lessee mentioned in this lease, as well as implied covenants, are not to be understood as conditions, and the breach of one or all of same will not work a forfeiture, abandonment or termination of this lease except the failure to drill, or pay or tender *rentals provided for in paragraph four (4)* hereof."

Paragraph 12 of the lease permits lessee to surrender the lease in whole or in part, but provides further: "thereupon Lessee

shall be relieved from all obligations, expressed or implied, of this agreement as to the acreage so surrendered, but such .release shall in no wise affect or diminish the amount of *minimum royalty* and *delay rental payable hereunder as provided* in Paragraphs 4 and 14 hereof."

"14. During the primary term of this lease if the royalty paid under the provisions of Paragraph 3 hereof for any given year, commencing on the 15th day of March and ending on the 14th day of March of the succeeding year, does not amount to as much as Fifteen Thousand Nine Hundred Forty-two and no/100 ($15,942.00) Dollars, then the difference between the amount so paid and the said sum of Fifteen· Thousand Nine Hundred Forty-two and no/100 ($15,942.00) Dollars shall be paid to Lessor. After the expiration of the primary term of this lease if the royalties paid under the provisions of Paragraph 3 hereof for any given year, commencing on the 15th day of March and ending on the 14th day of March of the succeeding year, do not amount to as much as Seven Thousand Nine Hundred Seventh-one and no/100 ($7,971.-00) Dollars, then the difference between the amount so paid and the said sum of Seven Thousand Nine Hundred Seventy-one and no/100 ($7,971.-00) Dollars shall be paid to .Lessor. Such amounts shall be paid within ninety (90) days from the expiration of said year. Payment or tender may be made to Lessor or to the depository bank named above by the check· or draft of Lessee mailed or delivered to Lessor or to said depository bank."

The lease was executed for a cash bonus of approximately $40,000 and delay rentals were paid for three years. On May 9, 1947, a gas well was completed that had a potential of 11,500,000 cubic feet of gas a day. Although it was a well producing gas in paying quantities, it was shut-in and has been shut-in continuously since that date. Since that time the lessee, Magnolia Petroleum Company, has paid annually the sums required of it by the lease.

Since May 9, 1947, the total sum of $63,-818 has been paid under the terms of the lease.

Some of the appellants are owners of royalty reservations or grants made prior to the date of the lease to Magnolia Petroleum Company, and others hold their interests by conveyances after the execution of the lease. We think the questions in the case may be decided without regard to the time the royalty interests were acquired.

When Santa Cruz Farm Company executed the lease to Magnolia Petroleum Company, it undoubtedly possessed the power to do so, and it was the owner of the exclusive leasing privileges or executive rights. At the time of the trial, Hidalgo-Willacy Oil Company had succeeded to those rights. That company at no time owned the surface to the lands in question.

The controversy in this case is whether, under the terms of the lease, the funds paid by Magnolia Petroleum Company as lessee, after May 9, 1947, the day the producing gas well was completed, are royalty or something else. Hidalgo-Willacy Oil Company, as the owner of the rentals and bonus, contends that the payments are not royalty. Appellants contend that the payments by the lessee, under the provisions of paragraphs 3 and 14 of the lease, are "minimum royalties," in which they as royalty owners should share.

Whatever the revenues may be determined to be, Magnolia Petroleum Company paid the exact amount required by the lease, and its rights under the lease are not here brought in question. No one by proper point complains about the method of payment, nor that payments were made to the depository bank rather than distributed among the royalty owners. That the· lessor or depository bank were made the payee by the lease is important only insofar as it may indicate the intention of the parties as to the nature of the payment.

Our attention will first be directed at·the lease itself to see if it reveals the intention of the parties. Paragraph 3(b) provides for a gas royalty and states: "and where not sold shall pay Fifty.($50.-

00) Dollars per annum as royalty from each such well, and while such royalty is so paid, such well shall be held to be a producing well under paragraph two hereof." The trial court held that the sum of $50, paid for the shut-in gas well on the leased land, was royalty and that the royalty owners would share in those payments. No appeal was made and no point is before us challenging that holding. When the gas well was brought in as a producer and then shut in, certain provisions of the lease came into operation for the first time. Prior to that occurrence, there was no question that the lessor was entitled to the funds paid as delay rentals under the provisions of paragraph 4 of the lease. To determine the nature of payments made after that occurrence, and to decide who should receive them, it is necessary to determine whether there was in fact production as contemplated by the lease. Paragraph 2 of the lease provides that the lease is for a ten-year primary term and "as long thereafter as oil, gas or other mineral is produced from said land." Paragraph 3 expressly provides that in the instance of a well where the gas is not sold, that $50 shall be paid annually as royalty, and while such royalty is paid, "such well shall be held to be a producing well," insofar as paragraph 2 is concerned. That paragraph states precisely that the situation that here exists constitutes a producing well. Since the royalty has been paid on the well, that is equivalent to production and sufficient to hold the entire acreage covered by the lease. We therefore have a producing well such as may hold the lease indefinitely, and that production or substituted production has never ceased. Freeman v. Magnolia Petroleum Co., 141 Tex. 274, 171 S.W.2d 339.

The fact of production worked a change of the relations theretofore existing between the parties to the lease. Production was the fact that introduced the operative effects of paragraphs 2, 3 and 14. It may prolong the lease beyond the primary term and indefinitely thereafter under the provisions of paragraph 2. Had that fact not occurred, the lease would terminate not later than the primary term regardless of

what sum was tendered. These different results stem from the different nature of the payments made before and after production. After production the option to pay delay rentals, provided by paragraph 4, ceased. That paragraph states: "If * * * gas * * * is not being produced from said land * * * on or before March 15, 1945, this lease shall terminate * * * unless * * * Lessee shall pay or tender to Lessor the sum of Fifteen Thousand Nine Hundred Forty-two and No/100 Dollars * * * as a rental." Since the fact of production did exist, the lease did not terminate upon a failure to comply with the delay rental provisions of paragraph 4. But after production, paragraph 3 required the lessee to pay royalty. Hence, the royalty under paragraph 3 was required to be paid, and the rentals under paragraph 4 were not required to be paid after production.

After production, however, paragraph 14 became operative and required certain payments. During the primary term, which is the period covered by this suit, paragraph 4 required that the difference between the royalty paid under paragraph 3 and $15,942 be paid. The distribution of those funds will vary, depending upon whether they are rents, royalty, bonus, or something else. Paragraph 14 itself does not undertake to define the nature of these payments. But the persons who executed the lease examined all its various clauses relating to production, rents, royalties and bonus; and out of the line-up, pointed their fingers at the paragraph requiring a "minimum royalty".

Paragraph 12 conjunctively speaks of "minimum royalty" and "delay rental." In selecting these names, it states that they are provided for in paragraphs 4 and 14. An examination of paragraph 4 shows that it is the usual delay rental clause. While it does not use the word "delay" in referring to it, as does paragraph 12, it does in fact permit delay of further operations upon payment of the stated sum. But the privilege of delaying further operations by payments under paragraph 4 ceased upon production, and thereafter any payments were required by reason of some other pro-

visions in the lease. It will be observed that paragraph 12 does not merely speak of rental, but "delay rental," which included the idea that something is postponed. It narrows "delay rental" to the confines of either paragraph 4 or 14. Unquestionably paragraph 4 is a delay rental clause and it does delay operations, but the payments required by paragraph 14 do not delay anything. Paragraph 14 does not delay operations or production, for production is required before it becomes . operative. Nor does it delay further development of the premises. Nothing may be found in the lease capable of that construction. Certainly there is nothing in paragraph 14 which purports to delay anything, and that is the only other paragraph referred to by paragraph 12. Paragraph 14 imposed a duty after production that continued so long as there was production, rather than a privilege to delay operations before production and during the primary term. If, therefore, paragraph 4 is the "delay rental" clause, and paragraph 14 delays nothing, paragraph 14 can not be a delay rental clause. Paragraph 12, therefore, identifies paragraph 4 as the delay rental clause.

But paragraph 12 also states that the lease provides for a "minimum royalty" either in paragraphs 4 or 14. Paragraph 4 has been identified as the delay rental clause, and moreover it in no way purports to be royalty of any kind. This leaves paragraph 14 as the only other paragraph mentioned that can satisfy the only other designation given by the parties. This conforms to the usual understanding of terms, for just like paragraph 4 provides for rentals to delay operations, paragraph 14 concerns payments which shall be paid after production. Whether the money is payable before or after production is only one of many other considerations, but, taken with paragraph 12, it appears that the parties described paragraph 4 as the "delay rental" clause and paragraph 14 as the "minimum royalty" clause. Any conclusion that the phrases are used as synonyms is ruled out by the words "minimum" and "delay". Paragraph 4 is a "delay rental" clause but is not "minimum royalty"; whereas, paragraph 14 may be

"minimum royalty," but not "delay rental." Hence, we think that paragraph 4 is the "delay rental" clause and that paragraph 14 is the "minimum royalty" clause. Moreover, after production, a lessee is under a duty to pay royalty, but before operations or production the payment of rentals is ordinarily optional with the lessee. The requirement in paragraph 14 to pay the minimum royalty is expressed by the obligatory "shall," which dispels the idea of any choice or option as in the case of a rental.

But there is still another eye-witness that names the paragraphs in the lease. Paragraph 9 speaks of the rental clause and it too picks out paragraph 4. While it does not exclude all other clauses, it does attribute to that clause a result usual to a rental clause, that of working a termination of the lease upon non-payment of rental. Paragraph 9 does not attribute the same result to paragraph 14.

And the final matter of construction is taken from paragraph 14 itself. By its terms it associates itself with paragraph 3, which clearly relates to royalty. Paragraph 14 does not state that rentals shall continue, nor does it refer to paragraph 4, the rental clause. It recognizes that after production, royalties under paragraph 3 commence. It infers that after production, rentals under pargraph 4 cease. It recognizes that production is the fact that terminates the rental clause and commences the operation of the royalty clause. Paragraph 14 recognizes that paragraph 3 and royalty come into operation after production. In referring to the royalty provisions of paragraph 3, paragraph 14 supplements the royalty by additional payments rather than reducing the rental payments by the amount of royalty paid under paragraph 3. Paragraph 14 associates itself with production rather than a postponement of production.

■ Non-participating royalty owners do not share in any of the rentals, and the rental clause provides that rentals may be paid to the lessor or to a named depository bank. Payments under the "minimum royalty" clause must be paid to the same payee, and the fact that the payees are the

same is urged as grounds that the interests are also the same. On such reasoning, every royalty provided in the royalty clause would also be rentals, for it too authorizes the payments to the lessor or delivery of the royalty oil to the credit of the lessors. We think that "lessor" in the minimum royalty clause, as in the royalty clause, embraces not only the lessor but also all others on whose behalf it acted in the exercise of its executive rights. Where, as here, there are scattered royalty interests, we do not consider the naming of a suitable depository as a payee for royalty owners as a violation of the standard of good faith owed by a lessor to the royalty owners.

■ We conclude that the parties selected the term "minimum royalty" as words of art by which they labeled what they intended. When parties prepare a finely wrought instrument and use terms of legal distinction, their classifications should be given great weight as the intentional expression of their purpose. Mitchell v. Mitchell, Tex.Sup., 244 S.W.2d 803, 806; 17 C.J.S., Contracts, § 302. To hold that the parties meant rent or bonus when they said royalty, when no mistake is urged, would be to attribute a carelessness to the parties not otherwise found in the lease. The choice of designating words may be of controlling importance. Totton v. Smith, 131 Tex. 219, 113 S.W.2d 517; Maxwell v. Hunter, 5 Cir., 116 F.2d 260. From this examination of the lease, we conclude that the payments made under paragraph 14 were intended to be just what the parties named them—"royalty."

We have been cited by appellees to several tax precedents, but tax gathering statutes which follow their own special definitions to effect special results are of slight aid in a case governed by local law concerning the ownership of oil or gas rentals, bonus, or royalty. Appellees rely upon such cases as Burnet v. Hutchinson Coal Co., Cir., 64 F.2d 275, 278, which involved a tax question, and also was a lease with an express provision that the payment would "be deemed and treated as rents". Appellants urge that the later case of Logan Coal & Timber Ass'n v. Helvering, Cir., 122 F.2d 848, declined to follow the Burnet opinion. But in none of the tax authorities was the question one of ownership. The United States Supreme Court in Burnet v. Harmel, 287 U.S. 103, 53 S. Ct. 74, 77, 77 L.Ed. 199, has acknowledged that an income tax statute gives effect to a nation-wide scheme of taxation without regard to local law. It said: "For the purpose of applying this section to the particular payments now under consideration, the act of Congress has its own criteria, irrespective of any particular characterization of the payments in the local law. * * The state law creates legal interests, but the federal statute determines when and how they shall be taxed." The Supreme Court in that case then proceeded to treat a bonus as an advance royalty for tax purposes, but certainly they are not the same in a dispute such as the one before us, when admittedly appellees get all the bonus, and admittedly they must share royalty with appellants. In the matter of ownership, "There is wide variance in the meanings of bonuses, rentals and royalties in connection with oil and gas conveyances and assignments. At any given time, as a general rule, only one of the component parts are produced. If one is receiving royalty he is not receiving rentals, and usually is not receiving bonuses. Royalty is no part of bonuses or rentals. In fact, neither of the three are any part of the other." Young v. Rudd, Tex.Civ.App., 226 S.W.2d 469, 475. Accord, Stephens v. Stephens, Tex.Civ.App., 292 S.W. 290, 293; Carroll v. Bowen, 180 Okl. 215, 68 P.2d 773; Maynard v. Ratliff, 297 Ky. 127, 179 S.W.2d 200.

We shall now see if there is anything in the law of Texas which prohibits our construction of the lease. Appellees, supported by dicta in several cases, reason that the minimum amounts required to be paid under the lease can not be royalty. The argument is that royalty can in no event exceed a one-eighth of actual production, even though the parties agree upon a greater amount. They reason that any greater fraction necessarily would be bonus or rental, or something else, and would go to those owners rather than

royalty owners. From this it is concluded that parties can not agree upon a monetary substitute for royalty. Consistent with this view, appellees reason that even the $50.00 paid for the shut-in gas well is not and can not be royalty; though the parties called it royalty, included it in the royalty clause, and it effected every result and served every purpose of royalty.

■ The point is urged that the substitute gas royalty payment, expressly provided in the royalty clause, is actually in the nature of a rental. This is made on the premise that it precedes drilling operations and production, notwithstanding the express provision that its payment constitutes, is equal to, and is a substitute for production after successful operations. Rather than delaying operations, its payment came at a time after the operations were commenced and completed as a commercially potential shut-in gas well. We are pointed to nothing that its payment could delay, if it is a delay rental. Since a non-participating royalty owner lives in hopes of production, which is an important purpose of a lease, Canadian River Gas Company v. Bivins, 137 Tex. 347, 153 S.W. 2d 432, 434, and since the owner of the executive rights owes the royalty owners utmost good faith, Schlittler v. Smith, 128 Tex. 628, 101 S.W.2d 543, Wintermann v. McDonald, 129 Tex. 275, 102 S.W.2d 167, 173, 104 S.W.2d 4, we think the issue of whether the lessor did create a royalty is not so important nor grave as the matter of whether the lessor could create a royalty different from the usual one-eighth out of actual production.

If that be the law, it means that in the instance of a shut-in well, though a non-participating royalty owner can receive no rentals or bonus, neither can he receive any royalty; while there can be a substitute production such as to hold all the acreage covered by a lease indefinitely, even after the primary term, the royalty owner would realize nothing, and through the vehicle of no kind of agreement could he receive anything out of that substitute production; and from that situation the royalty owner is helpless to relieve himself either by the laws of contract or the laws of property. If that be the law, it is not by reason of any existing statute or precedent, for the situation has never before been presented to a Texas court; and it would be strange indeed for the law of the subject to be settled before the question ever arose.

Appellees' position that royalties can only exist out of actual production comes from the dicta of four cases. In 1924 a dictum in United North & South Oil Co. v. Meredith, Tex.Civ.App., 258 S.W. 550, 556, 557, stated that mining of oil and gas is undertaken through "long-time leasehold contracts, which give to the lessees a large interest in the oil produced, usually ⅞, and to the owner usually only a royalty of ⅛, except where the prospects are considered sufficiently encouraging to warrant payment of a lump sum in addition, called a 'bonus,' * * *." The statement is in no way material to the decision in the case, and the word "usually" infers that sometimes the interests are different from those stated. This dictum is the fountainhead of the argument that a royalty can not exceed a one-eighth out of actual production. On such reasoning, it is just as sound to conclude that no lease can be made other than for a "long-time leasehold," which is another part of the dictum.

In 1926, in Andrews v. Brown, Tex.Civ. App., 283 S.W. 288, 292, concerning the rights of a life tenant to a cash bonus paid upon delivery of an oil and gas lease, the dictum of the Meredith case was quoted, but was again not material to the point of the case. Royalty was in no way an issue in the case, nor was there any question raised that the amount of cash was other than a bonus. Its ownership was in dispute, but the lease provided for a one-eighth royalty, and the cash there involved was undoubtedly a bonus by the terms of the lease.

In 1939, the same court that wrote the Meredith and Andrews cases decided Sheppard v. Stanolind Oil & Gas Co., Tex.Civ. App., 125 S.W.2d 643, 645. That was a case involving the construction of a statute imposing a gross production tax. For those taxation purposes the statute defined a producer to include "any person owning

any royalty or other interest in any oil or its value, whether produced by him, or by some other person on his behalf * * *." The statute made producers for tax purposes out of persons who were not producers in fact. It defined royalty owners to include "all persons owning any mineral rights under any producing leasehold" other than the working interest. The holding of the case, when limited to the controlling question as stated in the opinion, was that an oil payment of one-sixth out of five-sixths of the first oil produced would "stand on the same footing as royalties as regards the tax". The court applied the broad statutory definitions of the tax statute to an oil payment and reached the correct conclusion that the person owning it, like the royalty owner, was equally reached by a statute which defined its terms to include: "any person owning any royalty or other interest in any oil or its value, whether produced by him, or by some other person on his behalf". We do not think this case involving enlarged statutory definitions for a special taxation purpose can be authority for a different purpose. But, after the court discussed the matters concerned by the case, it again indulged for the third time in dictum, citing only its prior dicta, but for the first time stated that every royalty beyond the one-eighth royalty was bonus. The inference is that a larger royalty estate could not be carved, and the sum of all the reasons for this judicial restriction is that in 1924, a one-eighth royalty was usual—not compulsory.

The accumulating dicta were pressed to their ultimate in 1940 by the case of State Nat. Bank of Corpus Christi v. Morgan, 135 Tex. 509, 143 S.W.2d 757, 762. There again the court was considering an oil payment described as one-eighth of seven-eighths until a certain cash amount had been received. Whether the oil payment was royalty or bonus was the point in that case, and provision for an oil payment was made in a paragraph separate from the royalty clause. It stated that the payment was to be paid "In addition to all other reservations of royalties herein made * * *." The court expressly recognized that the point involved was not the same as in the Sheppard case, but relied upon the dictum in that case—not its holding—and stated that because a one-eighth was usual anything more was impossible. The sum of this cumulative dicta is that the usual, as of 1924, for unproved oil territory, which was in an early stage of a developing and expanding industry, is crystalized into positive law for all time and all circumstances, so that parties are powerless to contract for a royalty different from the usual. We have no quarrel with the statement that a one-eighth out of production is the usual royalty, but we do not accept the non sequitur that any provision for a greater or different royalty is beyond the realm of agreement. The usual one-eighth royalty no doubt is one indicia of a royalty, and in the absence of a stated fraction, that fraction is regarded as the royalty meant; but there are also other usual royalty provisions, particularly in the instance of gas production or shut-in wells. To restrict judicially the terms of leases or contracts to that which is usual is a far-reaching legal proposition which ignores important elements of change, competition, demand, circumstance, the creativeness of the oil industry and the law profession and the freedom to contract. To interpret intent by what is usual is one thing, but to interdict the power to contract by what is usual is another.

Were we to follow appellees' reasoning from these cases, that royalty can not differ from the usual, it would be of slight aid in the present dispute, for, on exactly the same reasoning, the money paid under paragraph 14 could not be rent or bonus, since the nature of the payment also differs from the usual rent or the usual bonus. And appellees advance no argument founded upon this line of dicta and the tax authorities which would not equally strike down the token cash payment of $50 paid as royalty under the royalty clause. Such royalty payments are certainly not uncommon. Such a conclusion means that a non-participating royalty owner by judicial fiat can do nothing to reduce the risk of shut-in production, but must endure his chains in perpetuity.

The Supreme Court did not rest its decision upon such reasoning, but upon the sound basis of identification of the subject matter with the several attributes of a royalty and a bonus. The one-eighth fraction is only one of the usual royalty attributes, but the controlling attribute of a royalty in that case was described as a continuance of the share of the product or profit throughout the term of the lease. Since the oil payment under examination either did not or might not continue throughout the term of the lease, it was held to be a bonus rather than royalty. We think that is the correct and only holding of the court.

If that be not the holding, any provision for a payment as a substitute for actual production for a shut-in well can never inure to the benefit of a royalty owner, but must be related to a bonus or rental. If that be not the holding, the not uncommon cash substitute for gas royalty, can not be royalty. This would be true in the instant case though no party objected to that portion of the trial court's holding. If the usual is controlling, one may wonder how the "unless" lease supplanted the "drill or pay" lease, how participating royalty owners came into being, whether a twenty-year lease can be made when a shorter lease is usual, how rental as used in oil and gas leases came to be something different from common law rental; or how an oil and gas lease, itself, which is an unusual document when compared with other sales of realty or hard minerals, ever originated. While the fact that something is unusual may be a negative indication of a subject's nature, other attributes of that subject must not be disregarded.

While we think that a one-eighth royalty is usual under the settled law of Texas, King v. First Nat. Bank of Wichita Falls, 144 Tex. 583, 192 S.W.2d 260, 163 A.L.R. 1128, we do not think that fraction is a legalistic ceiling on royalty clauses. Carroll v. Bowen, 180 Okl. 215, 68 P.2d 773, 774, said of royalty: "In the Osage Reservation, the Department of Interior exacts a sixth. The State receives a fourth from the wells that adorn the capitol grounds." In Greene v. Robison, 117 Tex. 516, 8 S.W.

2d 655, 660, the Supreme Court, after stating that a surface owner-agent would receive a one-sixteenth under the Relinquishment Act and that the state would receive a like amount, stated: "If a bonus is paid, if a *larger royalty* or other amounts are contracted for, the state and the owner of the soil receive equally in like amounts." The statement is again quoted by the Supreme Court in Lewis v. Oates, 145 Tex. 77, 195 S.W.2d 123, 129. There are other instances of judicial recognition of a greater royalty. Meyers v. Texas Co., 6 Cal.2d 610, 59 P.2d 132; Alamitos Land Co. v. Shell Oil Co., 3 Cal. 2d 396, 44 P.2d 573, 576. And cash substitutes for royalty in the instance of shut-in gas wells are not uncommon. Shell Oil Co. v. Goodroe, Tex.Civ.App., 197 S. W.2d 395. A cash substitute royalty, the payment of which would satisfy a substitute production as defined by the parties to a lease, has the endorsement of the Supreme Court under a royalty clause and a habendum clause almost identical to the one we are here construing. In a lease with the same lessee here involved, the Court said, in writing about the non-payment of the $50 cash substitute royalty: "It · necessarily follows, conversely, that while *the royalty* is not so paid, the well will not be held to be a producer under that paragraph." Freeman v. Magnolia Petroleum Co., 141 Tex. 274, 171 S.W.2d 339, 341.

The Supreme Court in State Nat. Bank of Corpus Christi v. Morgan compared the attributes of a royalty with the type of payment there concerned. We think we should follow that safer approach, inasmuch as the terms, "rents", "bonus" and "royalty" are better described than defined. With the reservation that special terms of a particular lease may change the usual rule, we think that ordinarily the terms have some general attributes that may be used as beacons to light the way. A royalty is usually expressed as a fractional interest. Belgam Oil Co. v. Wirt Franklin Petroleum Corporation, Tex.Civ. App., 209 S.W.2d 376, 379. The fraction is usually a one-eighth. State Nat. Bank of Corpus Christi v. Morgan, supra; Shep--

pard v. Stanolind Oil & Gas Co., supra. But parties may anticipate and provide against instances where production or marketing are thwarted, by permitting a substitute for the usual royalty. Freeman v. Magnolia Petroleum Co., supra; Shell Oil Co. v. Goodroe, Tex.Civ.App., 197 S.W.2d 395. Bonus "represents market value of a lease apart from royalties to be paid on production and the other considerations of the lease; and is a sum of money paid upon execution of a lease or agreed to be paid at some later date, usually out of the lessee's share of the first oil produced from the land." 3 Summers, Oil & Gas, § 571; State Nat. Bank of Corpus Christi v. Morgan, supra. Bonus is frequently computed at a cash amount per acre. Rental is ordinarily an annual cash amount computed on an acreage basis.

The payment of royalty after production does not delay further operations or excuse implied obligations, Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27, but an exercise of an option to pay rentals ordinarily will delay operations as long as the rentals are paid, but not beyond the primary term. Carroll v. Bowen, 180 Okl. 215, 68 P.2d 773; Maynard v. Ratliff, 297 Ky. 127, 179 S.W.2d 200.

The effect of production or other operations upon the obligations of the parties concerned in the lease is of importance. After production, as used in the lease, royalty obligations arise and continue throughout the life of the lease. Freeman v. Magnolia Petroleum Company, supra; Sheffield v. Hogg, 124 Tex. 290, 298, 77 S.W.2d 1021, 1024, 80 S.W.2d 741; Sheppard v. Stanolind Oil & Gas Co., supra; Patterson v. Texas Company, 5 Cir., 131 F.2d 998, 1001. And while a bonus may also be payable after production, it does not endure for the life of the lease. State Nat. Bank of Corpus Christi v. Morgan, supra; Geller v. Smith, 130 Cal.App. 485, 20 P.2d 102. The privilege to pay rentals ordinarily ceases upon commencement of operations or production, depending upon the words of the lease. Texas Co. v. Davis, 113 Tex. 321, 254 S.W. 304, 255 S.W. 601. But in the

event of a dry hole, as distinguished from production, provision is frequently made permitting but not requiring a resumption of rentals. Superior Oil Co. v. Stanolind Oil & Gas Co., Tex.Sup., 240 S.W.2d 281; 2 Summers, Oil & Gas, § 351.

Royalty may remain royalty though the lease permits its payment in kind or in money. Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472; Sheffield v. Hogg, supra. And so may a bonus. Veal v. Thomason, supra; State Nat. Bank of Corpus Christi v. Morgan, supra. But we find no instance where a rental is payable in kind. That result is inevitable when rentals precede rather than follow production.

Non-payment of royalty does not terminate a lease, in the absence of a specific clause to that effect. Wagoner Oil & Gas Co. v. Marlow, 137 Okl. 116, 278 P. 294; Kelley v. Ivyton Oil & Gas Co., 204 Ky. 804, 265 S.W. 309; Castle Brook Carbon Black Co. v. Ferrell, 76 W.Va. 300, 85 S.E. 544; Davis v. Chautauqua Oil & Gas Co., 78 Kan. 97, 96 P. 47. And we find no instance where non-payment of bonus effected a termination. But a failure to exercise an option to pay rentals works a termination of the usual "unless" lease. Humble Oil & Refining Co. v. Mullican, 144 Tex. 609, 192 S.W.2d 770; Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27.

After the primary term, production usually prolongs the usual "unless" lease indefinitely. Watson v. Rochmill, 137 Tex. 565, 155 S.W.2d 783; Garcia v. King, 139 Tex. 578, 164 S.W.2d 509; Waggoner Estate v. Sigler Oil Co., supra; Morrison v. Swaim, Tex.Civ.App., 220 S.W.2d 493. But after the primary term, the tender or payment of rentals will not prolong the usual "unless" lease. Tennant v. Matthews, Tex.Civ.App., 19 S.W.2d 1115. Drilling and operation expenses are usually not chargeable either to a royalty, bonus or rental owner.

The intention of the parties as revealed by the provisions of a specific lease is of great importance in describing the attributes and the nature of a payment.

This is illustrated by the case of Freeman v. Magnolia Petroleum Co., supra, which is authority for the proposition that parties to a lease may define the terms of a lease to effect their special intent. The lease in that case provided for "a *royalty* of $50.00 per year on each gas well from which gas only is produced while gas therefrom is not sold or used off the premises". That was a provision for a substitute royalty in place of a royalty out of actual production. The lease then defined production under the habendum clause to mean, "while *said royalty* is so paid, said well shall be held to be a producing well * * *." That was a provision for a substitute production rather than actual production. The failure to pay the substitute royalty after the primary term was a failure of substitute production, and since there was non-production under the definition of the lease, it terminated. In that case, it was the absence of production as defined by the lease, that resulted in the termination of the lease.

The court in recognizing a substitute for royalty and a substitute for production, approved the intention of the parties who by their lease "were privileged to define what they meant by the phrase 'a producing well'." That case in no way suggested that a rental was operative after the primary term to prolong the life of the lease, and we think the language of the court would have been the same whether the monetary substitute for royalty was $15,-942, rather than $50.

■■■ These interests have other attributes, but the important ones stated sufficiently reach the lease here concerned. We conclude that the law does not prohibit a royalty that is different from or greater than the usual fractional one-eighth out of actual production. The parties to the lease contracted for a substitute in place of that usual fraction, and while it was indirectly gauged by the number of acres, this evidences a desire that the royalty be not less than rentals, instead of an intent that royalty be in truth rentals. Payment of the minimum amounts does not delay any operations, and a minimum amount is required to be paid for the life of the lease, once production is obtained, even though it

be a substitute production. Since substitute production has been achieved, the usual situation is for royalty thereafter to be paid, and for rentals to cease. Payment of the minimum amounts was a duty since they "shall be paid to lessor" rather than an option, as is usual with a rental clause. And the intent, manifest from what we consider an express and unambiguous contract, is that the payments will be "minimum royalty."

The judgment of the trial court is reversed and here rendered construing the payments made under both paragraphs 3 and 14 of the lease during 1948, 1949, 1950 and 1951, as royalty payments. Judgment is rendered against the First National Bank of Mission, Texas, as stakeholder of the royalty payments made during 1950 and 1951, and against the bank, Lloyd M. Bentsen and Elmer C. Bentsen, jointly and severally for appellants' proportionate shares of the royalty payments made by Magnolia Petroleum Company for the years 1948 and 1949.

### On Motion for Rehearing

Appellants have moved that the judgment rendered herein be made specific as to the several appellants, which motion should be granted.

Accordingly, the judgment of this Court heretofore rendered on March 26, 1952, is set aside and judgment now rendered as follows:

The judgment of the trial court is reversed and judgment will be here entered construing the payments under both paragraphs 3 and 14 of the lease, during 1948, 1949, 1950 and 1951, as royalty payments, authorizing a joint and several recovery against First National Bank of Mission, Texas, Lloyd M. Bentsen and Elmer C. Bentsen, in favor of Priscilla Scott, for $1,764.62, together with interest on $882.31 from March 15, 1948, and with interest on $882.31 from March 15, 1949; in favor of Berto T. VanZandt for $588.20, with interest on $294.10 from March 15, 1948, and $294.10 from March 15, 1949; in favor of Priscilla Allen Scott for $588.20, with interest on $294.10 from March 15, 1948, and $294.10 from March 15, 1949; in favor

of Mary Margaret Scott for $588.20, with interest on $294.10 from March 15, 1948, and on $294.10 from March 15, 1949; in favor of Janie J. Ferguson for $1,930.24, with interest on $965.12 from March 15, 1948, and with interest on $965.12 from March 15, 1949; in favor of W. R. Montgomery for $1,930.24, with interest on $965.12 from March 15, 1948, and interest on $965.12 from March 15, 1949.

And judgment is rendered for the additional sums against the First National Bank of Mission, Texas, in favor of Priscilla Scott for $1,767.38; in favor of Berto T. VanZandt for $589.12; in favor of Priscilla Allen Scott for $589.12; in favor of Mary Margaret Scott for $589.12; in favor of Janie J. Ferguson for $1,933.26; in favor of W. R. Montgomery for $1,-933.26; in favor of William W. Morriss, Jr., for $4,383.40; and in favor of Nancy Morriss Collie as her separate property for $1,095.85.

All costs of this and the court below are adjudged against appellees, First National Bank of Mission, Texas, Lloyd M. Bentsen and Elmer C. Bentsen.