**Paul C. TEAS et al., Plaintiffs,**

*v.*

**TWENTIETH CENTURY–FOX FILM CORPORATION, Defendant.**

Civ. No. 7803.

United States District Court
N. D. Texas,
Dallas Division.

Sept. 4, 1959.

Ira Butler, Cantey, Hanger, Johnson, Scarborough & Gooch, by Gillis A. Johnson, Fort Worth, Tex., for plaintiffs.

Paul Carrington, Neth L. Leachman, Dallas, Tex., for defendant.

DAVIDSON, District Judge.

This suit involves the rights of the parties to participate in the proceeds of oil produced from certain valuable oil properties located within the limits of the City of Los Angeles, California.

The Fox Film Company of New York purchased valuable acreage in the City of Los Angeles, California, adjacent to Beverly Hills for the erection of a studio in the production of moving pictures to be sold and exhibited to the public. Oil had been discovered in certain portions of the city and in 1924 upon the passing of the title to the property in question it was expressly stipulated as follows:

> "No oil or gas well shall at any time be drilled, bored or explored on said property or any part thereof"

the owners and operators of the studio feeling that such drilling would interfere with their work in the production of pictures as planned by the studio.

Very rich production of oil was found in Long Beach and other portions of Los Angeles and it became apparent that the studio property was in all probability oil-bearing and in considerable quantities. The oil properties became more and more promising and drilling concerns approached the owners with reference to the execution of a lease thereon. The parties were confronted with the stipulation in the deed of years before that no drilling for oil should take place upon

744

the property. Before any drilling could take place it was necessary to get the restriction or limitation removed.

The property in question was made up of four tracts as will appear upon the attached map marked appendix "A".

PX-5

Los Angeles Country Club

RANCHO COUNTRY CLUB

HILLCREST COUNTRY CLUB

In order to have this restriction removed the Twentieth Century-Fox made a proposal to the Janss people and the Fox Hills Corporation and their successors in ownership seeking to effect a deal with them by which the restriction or limitation might be removed. The opening communication for the transaction was embraced in two identical letters to the Fox Hills Corporation and to Janss and contained the following paragraphs:

"* * * we shall pay you, or cause to be paid to you, when and as received by us or by any of our subsidiaries:

"(a) an amount equivalent to 8⅓% of the proceeds of all gas, oil or other hydrocarbon substances extracted from wells bottomed on the property hereinbefore described.

"(b) 50% of any bonus payments or land rentals (as distinguished from oil or gas royalties as the term royalties is generally understood and defined in connection with oil and gas leases) made by any lessee and received by us or by any of our subsidiaries as consideration for making or entering into any lease for the extraction of oil, gas or other hydrocarbon substances from wells bottomed on the said property hereinbefore described."

the property being described being that shown on the map.

The above proposal was accepted by the former owners who held the restrictions and limitations on the title. A written contract of considerable length set out in great detail the rights of the parties involved but contained in effect the foregoing conditions and obligations of paying 8⅓% of the gas and oil proceeds and also 50% bonus that might be received from the lease or development of the property. The contract releasing the restriction placed the burden and responsibility upon the owner in fee in whose favor the restrictions were relieved of leasing the property and paying over the 8⅓% of the royalty and 50% of the bonus. The owner of the

land thus became the agent, or we might say more accurately trustee, of the title to the property which obligated him in making the lease to make an equitable transaction so as not only to secure for the plaintiffs herein the 8⅓% of the royalty, which had been previously agreed to, but also to so negotiate if possible as to secure a bonus in which the plaintiffs would own a 50% interest.

Acting under the authority contained in this contract removing the restrictions, the Fox Realty Company, the defendant herein, executed a lease to the Universal Consolidated Oil Company, which company proceeded to develop the property and is now developing it, a number of wells having been drilled and payments being made from the proceeds. The lease actually drawn provides that the lessee, Universal Consolidated Oil Company, will pay a royalty of 20% and then further provides:

"(b) 50% variable participating royalty to be determined, computed and paid in a manner hereinafter provided in Section B of this agreement, which said 50% is hereinafter, for convenience, designated and referred to as 'variable participating royalty.'"

The plaintiffs insist and contend that this "variable participating royalty" was and is in fact a bonus and given this different name from ordinary royalty in an effort to escape paying ½ of the bonus as called for in the contract.

The plaintiffs claim one-half interest in this variable royalty when and if paid and also an equal share in the gross royalty of 20% on which the lease was executed.

At the time of the hearing of this controversy some discussion was had as to whether or not the terms of the agreement and of the several provisions of the agreement were free from ambiguity. The Court held that they were in no sense ambiguous, and as a help to the mind of the reader we now set forth the several provisions which will be in the nature of review of what we have just said.

By deed of date, May 15, 1924, duly recorded in the Deed Records of Los Angeles County we find the following restrictions:

"No oil or gas well shall at any time be drilled, bored or explored on said property or any part thereof."

Letter from the Twentieth Century-Fox Film Corporation to the Janss Investment Corporation dated February 3, 1943:

"Gentlemen:

"By deed of May 15, 1924 and recorded on August 12, 1924 at page 16 of Book 3508 of the Official Records of Los Angeles County Recorder, you conveyed to us (then known as the Fox Film Corporation) certain premises now occupied by us for studio purposes.

"One of the conditions, restrictions and reservations recited in said deed is:

" 'That no oil, or gas well, shall at any time be drilled, bored or explored on said property or any part thereof.' "

The writer proposes a modification of the contract and says:

"We agree that if we or any subsidiary that we control should at any time drill or permit others to drill wells bottomed upon our said studio premises we shall pay you, or cause to be paid to you, when and as received by us or any of our subsidiaries:

"(a) An amount equivalent to $8\frac{1}{3}\%$ of the proceeds of all gas, oil or other hydrocarbon substances extracted from wells bottomed on the property hereinbefore described.

"(b) 50% of any bonus payments or land rentals (as distinguished from oil or gas royalties as the term royalties is generally understood and defined in connection with oil and gas leases) made by any lessee and received by us or by any of our subsidiaries as consideration for making or entering into any lease for the extraction of oil, gas or other hydrocarbon substance from wells bottomed on the said property hereinbefore described.

\* \* \*

\* \* \* \* \*

"If this offer is accepted by you, please indicate the same by signing your name and affixing your corporate seal under the words 'Accepted' at the end of this offer, and when so signed, sealed and received by us, prior to the date above fixed, this letter shall constitute an agreement between us. . . . .

Signed: "Twentieth Century-Fox Film Corporation
"By s/ Wm. Goetz
Vice President
"Attest: s/ Geo. Wasson
Assistant Secretary

"Accepted:
"Janss Investment Corporation
"By s/ Edwin Janss
"Attest: Chas. D. Hayes
"Secretary"

An identical agreement was contained in a letter to the Fox Hills Realty Company and was accepted by them as of February 3, 1943.

Minutes of the Janss Investment Corporation of February 4 set forth the foregoing agreement and authorized its execution.

Thereafter a confirmatory agreement of the above correspondence and acceptances was entered into by the parties on the 15th day of April, 1943 in which was recited the original transaction in which the restriction against drilling was recited and then embodied in the agreement was the same one as contained in the letters giving the former owner $8\frac{1}{3}\%$ of the royalty and 50% of the bonus. This agreement was duly signed and executed by both parties.

"Janss Investment Corporation
"By s/ Edwin Janss
President
"By s/ Chas D. Hayes
Secretary
"First Party
"Twentieth Century-Fox Film Corporation
"By s/ Wm. Goetz
Vice President
"By s/ Geo. Wasson
Assistant Secretary

"Fox Realty Corporation of
California
"By s/ Alfred Wright
_____
                    Vice President
"By s/ Geo. Wasson
_____
                Assistant Secretary
"Second Parties"

Thereafter on the 21st day of March, 1952, the Fox Realty Company executed a lease to the Universal Consolidated Oil Company, a corporation. The lease described the land as shown in the foregoing map. It contains the following paragraphs relative to the royalty provision:

"Excepting, Reserving and Retaining unto Fox, its successors and assigns:

"(a) 11⅔% of all oil, gas and other hydrocarbon substances produced and saved from wells bottomed under the above described lands payable at the times and in the manner hereinafter provided in Section A of this agreement, which said 11⅔% is hereinafter, for convenience, designated and referred to as the 'royalty share;' and

"(b) 50% variable participating royalty to be determined, computed and paid in the manner hereinafter provided in Section B of this agreement, which said 50% is hereinafter, for convenience, designated and referred to as the 'variable participating royalty.'"

"Section A. Royalty Share.

"1. Eleven and two-thirds percent (11⅔%) of all oil, gas and other hydrocarbon substances produced, saved, sold or removed from wells bottomed under the demised lands is defined to be the 'royalty share' as such term is used herein in determining the manner, time and methods of computing the share of all such oil, gas and other hydrocarbon substances to which Lessor and its successors and assigns are entitled. * * *"

Then the letters provided that the lessee should pay 8⅓% royalty to the Janss and Fox Hills Company.

In describing the second provision in the lease that pertains to royalty it was expressly stated:

"Section B. Variable Participating Royalty

"The variable participating royalty reserved to Lessor hereunder shall be determined, computed and paid as follows:

"1. After the exclusion of said royalty share (to-wit, 11⅔% of all oil, gas and other hydrocarbon substances produced, saved, sold or removed from wells bottomed under the demised lands and any amounts of oil or gas used or lost by Lessee in its operations under this agreement, and after the further exclusion of the Janss share (less any portion thereof which may not be deductible therefrom by virtue of the provisions of the contracts described and set forth in paragraph 9 of Section A hereof but which would be deductible fom Lessee's share under the provisions of this lease), all remaining oil, gas and other hydrocarbon substances produced, saved, sold or removed by means of wells bottomed under the demised lands shall be called 'operating production.'

"2. The term 'lease account' as used herein shall be construed to mean the account in which Lessee enters all income and all chargeable expenditures for the computation of the variable participating royalty under this lease, and the term 'variable participating royalty,' as it is used in this agreement, is hereby defined to be Lessor's proportionate share (to-wit, 50%) of operating production remaining after the recovery by Lessee of the following chargeable expenditures hereunder * * *."

There being no ambiguity in the foregoing provisions which led up to the

drilling contract, the question before the Court is does the defendant, charged as it was with the execution of the lease, made to the Universal Consolidated Oil Company, owe the plaintiffs any bonus or bonus money resulting from the foregoing transaction.

■ The terms "royalty" and "bonus" have been defined as follows:

A "royalty" has definite characteristics which distinguish it from "bonus" and "rentals." "Royalty" is always defined as a certain fraction or percentage of the minerals which are retained by the owner of the land, as distinguished from a fixed or definite amount of money. The "royalty" continues throughout the whole term of the lease or until the minerals are depleted or exhausted. It is a reservation by the owner of a share of the product or profit from the land.

"Bonus," on the other hand, is a sum of money, fixed in amount, paid by a lessee to the owner of land as consideration for the execution of the lease, which lease entitles the lessee to explore the property in search of minerals. Said sum is normally paid in cash upon the execution of the lease, which lease entitles the lessee to explore the property in search of minerals. Said sum is normally paid in cash upon the execution of the lease but on some occasion may be deferred and may become payable out of designated funds, including proceeds from later drilling operations. The essential characteristic of a "bonus" is not the form of the payment but rather the certainty as to the amount of the obligation.

"Bonus" has frequently been defined in the many decisions throughout the country.

■ In the case of Griffith v. Taylor by the Supreme Court of Texas, 156 Tex. 1, 291 S.W.2d 673, 676, a definition is given which we also adopt: "In its broadest sense 'bonus' is any consideration given for a lease over and above the usual ⅛th royalty, whether the additional consideration be paid or payable and whether paid in cash or payable out of

production". Quoting Black's Law Dictionary and other authorities.

The same decision goes further and defines the term:

"When used in this sense 'bonus' would include a share of production reserved in a lease in excess of the usual ⅛th even if the excess share was to continue throughout the life of the lease."

As we have before stated, the defendant in executing this lease acted not only for itself but for those who had signed this contract authorizing it to make the lease. Thus the defendant, Twentieth Century-Fox Film Corporation, had undertaken and agreed to execute a lease on the property in good faith and to give to the plaintiffs a royalty of $8\frac{1}{3}\%$ of the production and in addition thereto to give the plaintiffs one-half of any bonus that might be received. Now if the defendant had provided in the lease for a bonus and stipulated what the bonus consisted of, then there would have been no ground for this lawsuit. But the lease being free from ambiguity, in the light of the contract and the relation of the parties the defendant's obligation as trustee was apparent. If it could have procured a bonus, it was its duty to have done so.

The defendant was able to lease the land on a royalty of the gross production of 20% showing that it was a valuable oil property, since ⅛ or ⅙ was ordinarily provided for in undeveloped regions. That it was further able to secure a variable royalty out of the net production shows conclusively that the lease had value over and above the ordinary leasable territory and for which a bonus could have been easily and reasonably required.

When the defendant executed the lease for a 20% gross royalty and a 50% variable royalty it was providing for some money to be received by itself that could otherwise have been treated as a bonus.

■ Now when the trustee makes a transaction in which he and the beneficiary of his trust are both interested

and the trustee is authorized to act for both parties he must exact for his beneficiary every benefit that he exacts for himself. The plaintiffs were not present when that lease was drawn and could only speak through the trustee whose duty it was to speak and act for them.

■ It is our opinion that the 50% "variable royalty" is a part of the bonus when and if produced which was covered by the contract between the parties.

■ Now we turn back to the 20% gross royalty. By previous contract and agreement 8⅓% belonged to the plaintiffs, whereas the lease rights out of the gross production was 20%. This left 11⅔% for the trustee and only 8⅓% to the plaintiffs which they were already entitled to under the previous contract. It was the duty of the defendant in executing that lease, under the terms of the conditions under which it became trustee and under the conditions in which it was authorized to act, to procure a bonus, and in addition to the variable royalty give the other party 50% of the lease for 20% and not limit plaintiffs to that which already belonged to them. It is the view of the Court that that royalty on gross production of 20% should have been divided equally so that the plaintiffs in addition to their 8⅓% should have received enough of the 20% to have given them at least enough to give the parties share and share alike so that from the gross proceeds the plaintiffs and the defendant would have been entitled to a royalty of 10% each.

In this same connection our attention has just been called to the decision of the Court and valuable comments thereon by the Supreme Court of Oklahoma in the case of Sykes v. Dillingham, 318 P.2d 416, 417, from which we take the following:

"The litigation stems from a clause in a mineral deed whereby Dillingham conveyed his undivided ¼th mineral interest in 30 acres of land to Sykes. This mineral deed dated October 20, 1923, otherwise in the usual form, contained the following provision: 'It is agreed that the grantor shall have one-half of the bonus money derived from the sale of an oil and gas lease or extension of same on the above land.' The problem is to determine whether Dillingham is entitled to one-half of the 'bonus money' received by Sykes on a lease executed by him in 1952 and, if so, whether the 'bonus money' would include a portion of the 'excess royalty' * * *

"The trial court found generally in favor of the defendant, Dillingham, giving him one-half of the cash bonus paid by the oil and gas lessee to Sykes as well as one-half of the 'royalty' reserved by Sykes in excess of ⅛th of the production. Plaintiff, Sykes, appeals.

*        *        *        *        *

"We conclude that defendant Dillingham is entitled to one-half of the cash bonus and we think it follows that he is entitled to one-half of the 'excess royalty.' "

In commenting upon this decision Professor E. O. Kuntz makes the following very pertinent observations:

"Where one party holds the executive right or exclusive leasing power and other parties hold the right to share in royalties or the right to share in bonuses, the holder of the leasing power should be required to exercise the utmost fair dealing in establishing the amount of the royalty and the amount of the bonus. See Morriss v. First National Bank of Mission [249 S.W.2d 269], 1 O&GR 1371 (Tex.Civ.App. 1952), and discussion notes, 1 O&GR 1388; see also Jones, 'Non-Participating Royalty,' 26 Texas L. Rev. 569 (1948). In the Morriss case, while examining the problem of whether a shut-in royalty was royalty or rental, a Texas court significantly said: '[W]e think the issue of whether the lessor *did* create a royalty is not so important nor grave as the matter of whether the lessor *could* create a royalty differ-

ent from the usual one-eighth out of actual production.' 1 O&GR 1371, 1380. (Emphasis supplied.) Considering as being done that which ought to be done, to borrow an ancient equity maxim, the court could reach the conclusion that the payment is bonus or royalty or rental, depending upon what utmost fair dealing would have required as between the holder of the leasing power and the holder of the interest subject to such power * * *." 8 O&GR 312, 313.

It is the opinion and judgment of the Court that the plaintiffs would be entitled to 10% of the gross royalty. Thus an additional 1⅔% should be paid to them as a part of what was due them as a bonus and that the plaintiffs are further due as a part of their bonus 50% of the "variable royalty" mentioned in the lease contract as payable to the lessor.

We have heretofore ruled in pretrial hearing that several parties owning a very minute interest in this controversy were brought into court as involuntary plaintiffs, that is, their interest was identical with that of those who brought the suit, and although being small in quantity they were proper parties to the suit. Objection is made to their being called involuntary plaintiffs. Had they been brought in by process as defendant it would have appeared from the pleading that they were entitled to recover as the plaintiffs were entitled to recover and it would thus have been the duty of the Court to have aligned them on that side of the controversy and such being true we overrule the objection to their being called involuntary plaintiffs.

We have at various stages of these proceedings overruled defendant's objection to jurisdiction, venue and other questions and points raised in this vigorously fought controversy, these are adhered without further enumerating here.

This law suit virtually crystallizes around two documents. "A", the con-

tract of April 15, 1943, dealing with and providing for under conditions named a royalty and a bonus. "B", the lease of March 21, 1952. The second paper manifestly seeks to avoid the obligations imposed by the first. Judgment is rendered for plaintiffs in accordance herewith.

In the trial of this case vast records of documents and depositions have been compiled and accumulated. These were largely dealing with the supposed ambiguity in the contracts, which issue we find is not in the case. We will, therefore, direct that each party bear his own cost. This we would assume could be done from moneys being paid as present royalties from the pipe line handling the oil under agreement between the parties.